# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| BASHO TECHNOLOGIES HOLDCO B, LLC, BASHO TECHNOLOGIES HOLDCO C, LLC, BASHO TECHNOLOGIES HOLDCO E, LLC, HUNOBY ENTERPRISES, LLC, and EARL P. GALLEHER, III, individually and derivatively on behalf of Basho Technologies, Inc., <br><br> Plaintiffs, <br><br> v. <br><br> GEORGETOWN BASHO INVESTORS, LLC, a Delaware limited liability company, NEWPORT BEACH INVESTORS, LLC, a Delaware limited liability company, CHESTER C. DAVENPORT, ROBERT L. REISLEY, JONATHAN FOTOS, ATSUSHI YAMANAKA, and ADAM J. WRAY, <br><br> Defendants, <br><br> and <br><br> BASHO TECHNOLOGIES, INC., a Delaware corporation, <br><br> Nominal Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) C.A. No. 11802-VCL ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

## MEMORANDUM OPINION

Date Submitted: April 9, 2018
Date Decided: July 6, 2018

R. Montgomery Donaldson, Robert A. Penza, POLSINELLI PC, Wilmington, Delaware; Robert V. Spake, POLSINELLI PC, Kansas City, Missouri; *Attorneys for Plaintiffs*.

Barry M. Klayman, COZEN O'CONNOR, Wilmington, Delaware; Lezlie Madden, COZEN O'CONNOR, Philadelphia, Pennsylvania; *Attorneys for Defendants*.

**LASTER, V.C.**

Nominal defendant Basho Technologies, Inc. ("Basho" or the "Company") was a promising, early-stage technology company. In 2010, defendant Georgetown Basho Investors, LLC ("Georgetown") invested in Basho. Defendant Chester Davenport controlled Georgetown and served as its President and Managing Member. Davenport joined the Company's board of directors (the "Board").

Over the next three years, Georgetown led or co-led a series of preferred stock financings for Basho. Through them, Georgetown gained blocking rights that enabled it to control Basho's access to capital. As Davenport recognized and emphasized repeatedly, the blocking rights gave Georgetown effective control over the Company when the Company was on the verge of running out of money.

In 2013, after maneuvering the Company into a positon of maximum financial distress, Georgetown and Davenport forced through a Series G financing round that was highly favorable to Georgetown and unfair to Basho and its other investors. The Series G round also gave Georgetown hard control.

After achieving hard control, Georgetown added defendant Jonathan Fotos, a Georgetown employee, to the Board. Davenport, Fotos, and their allies on the Board took steps to consolidate their control, including by creating an Executive Committee through which Davenport and another Georgetown representative ran the Company. They caused Basho to engage in self-dealing transactions, and they turned down sources of capital that would have undermined their control. Three outside directors left the Board, as did the CEO, other senior managers, and key employees.

1

Davenport hoped to sell Basho and channel the bulk of the proceeds to Georgetown through its preferred stock holdings. Davenport thought that other investors would eagerly participate in the Series G financing that Georgetown had extracted, thereby providing the Company with necessary financing. Instead, investors viewed Georgetown's oppressive actions as a red flag and questioned Basho's ability to succeed. Georgetown was not able to generate any significant outside funding for Basho, nor was it able to achieve a sale.

Basho never recovered. In 2016, Basho entered receivership and was liquidated. Its equity was worthless.

The plaintiffs are former holders of common and preferred stock issued by Basho. They filed suit, claiming that various combinations of defendants breached their fiduciary duties, aided and abetted breaches of duty by other defendants, or committed other wrongs. During the course of the litigation, the plaintiffs' focus narrowed to a claim for breach of fiduciary duty against Georgetown, Davenport, and Fotos.

The plaintiffs proved at trial that Georgetown and Davenport exercised effective control over Basho in connection with the Series G financing. As a result, Georgetown and Davenport had the burden of proving that the terms of the Series G financing were entirely fair. They failed to carry that burden. As a remedy for the injury inflicted by the Series G financing, this decision holds Georgetown and Davenport jointly and severally liable for compensatory damages of $17,490,650, plus pre- and post-judgment interest calculated at the legal rate, compounded quarterly, and running from January 23, 2013, to the date of payment, with the rate of interest fluctuating with changes in the legal rate.

2

The plaintiffs proved at trial that after the Series G financing, Georgetown and Davenport continued to control Basho. They further proved that Georgetown, Davenport, and Fotos caused Basho to engage in self-dealing transactions and took other self-interested actions. The defendants did not make any meaningful effort at trial to prove that their actions were entirely fair. They bore the burden of proof on this issue, which they failed to meet.

The plaintiffs did not seek transaction-specific damages awards for the actions that the defendants took after the Series G financing. Instead, the plaintiffs sought a damages award equal to the difference between the value of their shares after the Series G financing and the value at the time of trial, which is zero. The plaintiffs convinced me that on the facts presented, that award is warranted. As a remedy for their actions after the Series G round, this decision holds Georgetown, Davenport, and Fotos jointly and severally liable for damages in the amount of $2,778,228, plus post-judgment interest calculated at the legal rate, compounded quarterly, and running from the date of judgment until the date of payment, with the rate of interest fluctuating with changes in the legal rate.

## I. FACTUAL BACKGROUND

Trial took place over four days. The parties submitted 866 joint exhibits, lodged twelve depositions, and presented live testimony from four fact witnesses and one expert. The parties made the court's task more difficult by submitting exhibits that were not in chronological order. The exhibits also included many imaged emails that appeared in (at best) six-point font.

3

To facilitate fact-finding, courts evaluate evidence against a burden of proof. For this case, the appropriate standard of proof was straightforward: a preponderance of the evidence.[1] The question of who bore it was complex.

For the breach of fiduciary duty claim, the plaintiff bore the burden of proving that Georgetown owed fiduciary duties in connection with the Series G financing. With the plaintiff having carried that burden, Georgetown and Davenport bore the burden of proving that the Series G financing was entirely fair.[2] The defendants bore the burden of proof on their affirmative defense of acquiescence. The plaintiffs bore the burden of proof on remedial issues. The same structure governed the analysis of Georgetown, Davenport, and Fotos' actions after the Series G financing. Within this framework, the following facts were proven by a preponderance of the evidence.

## A.  Basho's Early Stages

In 2008, plaintiff Earl Galleher and a colleague co-founded Basho.[3] Galleher became President, CEO, and Chairman of the Board.

---

[1] *See Estate of Osborn ex rel. Osborn v. Kemp*, 2009 WL 2586783, at *4 (Del. Ch. Aug. 20, 2009) ("Typically, in a post-trial opinion, the court evaluates the parties' claims using a preponderance of the evidence standard."), *aff'd*, 991 A.2d 1153 (Del. 2010).

[2] *See Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012).

[3] PTO ¶¶ 13-14; Galleher Tr. 133. Citations in the form "PTO" refer to stipulated facts in the pre-trial order. *See* Dkt. 219. Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX — at ——" refer to trial exhibits using the JX-based page numbers generated for trial.

Galleher raised a Series A round of financing based on a business plan for a web-based sales product. When that plan failed to generate results, Galleher re-focused Basho on developing a distributed database product.[4]

Galleher tried unsuccessfully to raise venture capital to fund the database product.[5] In February 2009, Galleher personally led a Series B round. He bought shares in his own name, as he had in the Series A round, and he also formed an investor group that invested through plaintiff Basho Technologies Holdco B, LLC.[6]

In August 2010, Basho needed more money, and Galleher led a Series C round.[7] Once again he bought shares in his own name and formed an investor group that invested through plaintiff Basho Technologies Holdco C, LLC.[8] Plaintiff Hunoby Enterprises, LLC also owns common stock in Basho and invested in the Series A, B, and C rounds.[9]

---

[4] JX 750 at 5-9; Galleher Tr. 138, 142.

[5] Galleher Tr. 145-46.

[6] PTO ¶ 1.

[7] *Id.* ¶ 16.

[8] *Id.* ¶ 2.

[9] *Id.* ¶ 4.

**B. Georgetown Invests In Basho.**

By early 2011, Basho needed additional funding.[10] Galleher met with Don Rippert, the chief technology officer at Accenture PLC.[11] Rippert liked Basho's technology, but Accenture passed on the investment.

By chance, Rippert met Davenport and mentioned Basho.[12] Davenport was a lawyer who had worked in various roles, including as a name partner in a law firm, as chairman of a publicly traded corporation, and as assistant secretary in the U.S. Department of Transportation.[13] Davenport had formed non-party Georgetown Partners LLC in 1987 as a vehicle for private equity investments.[14]

Rippert put Davenport in touch with Galleher,[15] who pitched him on an investment.[16] Davenport had Fotos research Basho and its industry.[17] They thought

---

[10] JX 11.

[11] Galleher Tr. 149.

[12] *Id.* at 150; Davenport Tr. 375.

[13] Davenport Tr. at 368.

[14] *See id.* at 370-75.

[15] *Id.* at 376; Galleher Tr. 150.

[16] Davenport Tr. 377.

[17] *Id.* at 377; Fotos Tr. 727-28.

Georgetown could generate quick and outsized profits by investing in Basho and selling it within two years.[18] Davenport agreed to have Georgetown lead a Series D round.

The Series D round closed in February 2011.[19] The full amount of the Series D round was $5 million.[20] Georgetown invested approximately $2 million, and Davenport joined the Board.[21] At that point, the Board comprised Galleher, Davenport, Dr. Eric Brewer, Anthony Thornley, and Jorn Larsen. Brewer was a tenured computer science professor at the University of California at Berkeley.[22] Thornley had served as President and COO of Qualcomm Inc. and as a director of Callaway Golf Company.[23] Larsen was a representative of a Danish venture capital firm that participated in the Series D round.[24]

During the quarter that immediately followed Georgetown's investment, Basho's performance suffered.[25] Galleher agreed with the other directors that it was time for him to step aside as CEO. Galleher recruited Rippert to replace him in that role.

---

[18] *See* JX 15 at Fotos 0001670-71 (planning a sale of Basho in early 2013).

[19] PTO ¶ 20.

[20] *Id.*

[21] *Id.* ¶¶ 8, 21; *see* Galleher Tr. 151-52; Davenport Tr. 380.

[22] PTO ¶ 17; *see* Galleher Tr. 172.

[23] PTO ¶ 18; *see* JX 810.

[24] Galleher Tr. 173-74.

[25] *Id.* at 155; Fotos Tr. 733.

7

In July 2011, Rippert took over as CEO of Basho.[26] Galleher remained Chairman of the Board. To recruit Rippert, Galleher and Davenport agreed to provide the Company with additional funding by investing $5 million in a Series E round, which they split evenly.[27] Galleher led an investor group that invested in the round through plaintiff Basho Technologies Holdco E, LLC.[28]

## C.     The Series F Round

By early 2012, it was clear that Basho would need more funding before achieving profitability. Davenport announced that he would take charge of the fundraising efforts. Galleher supported Davenport. After the Series E round, Galleher had exhausted his own resources, and he was ready to let Davenport take the lead on fundraising.[29]

Davenport proposed to have Georgetown invest $10 million in a Series F round at a pre-money valuation for Basho of $75 million. Rippert, Brewer, and others opposed the term sheet because they believed that it would give Georgetown majority control.[30] At the time, Galleher trusted Davenport, and he was frustrated that the Board would not accept Georgetown's proposal.[31] Meanwhile, Rippert solicited an investment from IDC Frontier

---

[26] *See* JX 6; Galleher Tr. 136, 154; Davenport Tr. 384-85.

[27] Galleher Tr. 155; *see* PTO ¶ 16.

[28] PTO ¶ 3.

[29] *See* Galleher Tr. 155, 163-64.

[30] *Id.* at 168.

[31] *Id.*; JX 16.

8

Inc. ("IDCF"), a large Japanese website-hosting company that was one of Basho's customers.[32] IDCF wanted to invest to "strengthen a mutual technical cooperation and collaboration."[33]

In June 2012, Basho completed a modified Series F round that avoided giving Georgetown majority control by including IDCF and reducing Georgetown's participation. IDCF invested $6.1 million and received the right to designate a member of the Board. The relevant designee for purposes of this decision is Atsushi Yamanaka, who joined the Board in February 2013.[34] Georgetown invested $5 million and received an option to invest another $5 million.[35] Georgetown also received the right to designate a second director in addition to Davenport.[36] Georgetown designated defendant Robert Reisley, an associate and confidante of Davenport's who was a member and officer of Georgetown. Reisley also was the president and co-founder of Evergreen Capital Advisors, Inc., a consulting firm that had advised Georgetown on its investment in Basho.[37]

---

[32] Galleher Tr. 169-70.

[33] *See* JX 19 (IDCF investment memorandum to Basho explaining purpose of investment); JX 357 (IDCF Board appointee's response to crisis over Series G Financing); Yamanaka Dep. 6-10 (describing his role on Board).

[34] PTO ¶ 11.

[35] *See* JX 13; Galleher Tr. 169.

[36] Davenport Tr. 383.

[37] PTO ¶ 23; *see* Davenport Tr. 381-82.

9

The shares of preferred stock sold in the Series F round carried blocking rights. Among other things, without the consent of holders of a majority of the outstanding Series F shares, Basho could not

> either directly or indirectly by amendment, merger, consolidation or otherwise, . . . issue any class of stock having any right, preference, or priority superior to or *pari passu* with the Series F Preferred Stock, or amend, alter or repeal any provision of the Certificate of Incorporation or Bylaws of the Corporation in a manner that changes the powers, preferences, or special rights of the Series F Preferred Stock so as to affect them adversely, which does not so affect the entire class of Preferred Stock.[38]

As the holder of a majority of the Series F preferred stock, Georgetown controlled the blocking right.

Davenport wanted to "sell the Company in early 2013."[39] He believed that the Series F round gave Georgetown negative control over Basho because Georgetown could prevent the Company from engaging in an extraordinary transaction or raising outside funding without Georgetown's consent.[40] As a result, the Series F financing had put Georgetown "in the position of being the sole life line of the Company for money until 2013."[41] Davenport expected that Basho would need additional capital and would ask Georgetown to exercise its option to invest another $5 million. At that point, Georgetown could block the Company from obtaining another deal, insist on receiving full control in return for

---

[38] JX 378 § B.3.5; *see also id.* §§ B.3.3-4; Davenport Tr. 383-84.

[39] JX 14 at 1.

[40] *See id.*; JX 15 at 1.

[41] JX 15 at 1.

exercising its option, and then force a near-term sale.[42] In any sale, Davenport believed that Georgetown's preferred stock would give it "the largest share of the proceeds."[43]

Davenport urged his team at Georgetown to "think about the best way to plot our exit."[44] For assistance, Davenport reached out to Cowen & Co., an investment bank that had a longstanding relationship with Georgetown and where Davenport had personal connections to the head of the firm.[45]

Shortly thereafter, Davenport told Galleher that he wanted to "exit Basho in an expedited manner" and that "[t]he only issue is how much money can we get . . . and how

---

[42] *See* JX 14 (Davenport: "My objective is to sell the Company in early 2013. Assuming we exercise our option we will get the largest share of the proceeds of sale."); JX 30 (Davenport: "My objective is to take total control of this Company in exchange for our $5M option investment and force a near term exit that we control."); *id.* ("These guys by trying to be clever have put us in the position for $5M to control everything in the Company to the exit and the exit itself. So much for people who are too smart by half."); *id.* ("I don't want any additional investors until we decide it is in our interest."); *id.* ("This is how you can gain actual control of the Company and force a near term exit."); JX 32 ("I would like to use the exercise of our $5M option as the vehicle for the Basho exit."); *see also* JX 64 (Davenport stating after the Series F round that "[w]e have negative control of the Company"); JX 72 (Galleher telling Davenport after the Series F round that "I know you hold negative control of the company at this point. I hope that will not diminish my voice in our continued collaboration."); Davenport Tr. 521-28.

[43] JX 14.

[44] *Id.*

[45] Davenport Tr. 398-99, 548; *see* JX 32 (Davenport: "To get this process started I am going to talk to the bankers at Cowen to get their view."); *see also* JX 35 (email exchange regarding Cowen giving a presentation to the Board about strategic alternatives including sale); JX 63 (Davenport threatening to speak with head of Cowen if issues were not resolved); Collins Tr. 9-10 (describing Georgetown's desire to hire Cowen).

11

quickly."[46] He claimed that based on the low end of a valuation range that Cowen had given him, Galleher should receive at least $21 million in a sale.[47] At trial, Galleher testified that he "didn't care" about the money, but decided to support Davenport because the "guy who controls the company [was] telling me he wants to sell the company."[48]

Rippert, by contrast, did not want to sell the Company. He thought that he had been hired to grow the Company. Davenport began plotting ways to neutralize Rippert and ensure that if Rippert did not support a sale, he at least would not be able to interfere.[49]

## D.    Georgetown Blocks Other Investments.

Consistent with his expressed desire to "force a near term exit that Georgetown control[s],"[50] Davenport tried to position himself as the point person for any efforts to raise capital. He argued that this would enable Rippert to concentrate on Basho's operations.[51]

---

[46] JX 41. After emailing Galleher, Davenport asked his team at Georgetown for "any thoughts you have as to how we make Earl understand that this is real and not a continuation of the small time thing they have been doing since 2007." JX 40 at Fotos 0011988.

[47] JX 41.

[48] Galleher Tr. 178.

[49] *See* JX 42 at EPG-0007347 (threatening to put Rippert's "30 year career and net worth . . . in grave jeopardy"); JX 43 at Fotos 0002204 (declaring that Georgetown had "outflanked" Rippert).

[50] JX 30 at 1.

[51] *See* JX 20.

In reality, Davenport wanted to avoid any financing that would impede Georgetown's control.

Rippert, however, continued to look for alternative sources of financing that would enable the Company to achieve its business plan. In September 2012, Rippert secured an executed term sheet from Updata Venture Partners, a technology-focused venture capital firm. The term sheet contemplated Updata leading a Series F-1 investment round with a $10 million investment at a pre-money valuation of $71 million.[52] The transaction would have deprived Georgetown of some of its blocking rights, so Davenport viewed it as a "non-starter."[53] As an alternative to the Updata term sheet, Georgetown proposed to provide Basho with a loan of $5 million at an interest rate of 5% per annum, payable annually, and convertible at Georgetown's option.[54]

During a meeting on October 10, 2012, the Board discussed the Updata term sheet and the Georgetown loan.[55] Proceeding with the Updata proposal required approval by holders of a majority of the Series F preferred stock; Davenport announced that Georgetown would not consent. The Board resolved to terminate discussions with Updata and enter into negotiations with Georgetown over the loan.[56] To make the terms of the loan

---

[52] JX 38.

[53] JX 106 at 1; *see also* JX 30; Davenport Tr. 389, 520-21; Fotos Tr. 733-34.

[54] JX 44 at BTH00032189.

[55] JX 39 at BTH00012168.

[56] *Id.*

less unattractive when compared to the Updata term sheet, Georgetown nominally increased the total authorized borrowings to $7.5 million, with Georgetown providing $5 million and allowing for the additional $2.5 million to be provided by either Georgetown or other preferred investors. Georgetown also increased the interest rate to 7.5% per annum, payable quarterly. [57] The loan was convertible into Series F preferred stock and came with warrants to purchase 500,000 shares of Series F preferred stock at $1.515 per share as compensation for providing the loan commitment.[58] Georgetown insisted as a condition to extending the loan that the Company retain Cowen as its financial advisor.[59]

Shortly after the October meeting, Rippert received a term sheet from Tokyo Electron Devices Ltd., which was one of the Company's customers.[60] The term sheet contemplated an investment of $3.75 million at a pre-money valuation of $81.5 million, but Tokyo Electron was primarily interested in receiving commercial commitments, including a reseller discount.[61] Rippert argued that the Tokyo Electron investment was

---

[57] JX 44 at BTH00032189; JX 50 at BTH00026435.

[58] *See* JX 50 at BTH00026435; JX 66 at REISLEY 026136; *see also* Reisley Dep. 109. Georgetown ultimately committed to fund $7.45 million and received warrants to purchase 496,666 shares of Series F preferred stock. Harbor Island Equity Partners, LLC, committed to fund the remaining $50,000 and received warrants to purchase 3,334 shares. JX 51 at BTH00028806.

[59] *See* JX 39; Collins Tr. 9-10; *see also* JX 44 at BTH00032190 (noting that under revised terms of loan, "Engagement of Cowen required").

[60] JX 43 at Fotos 0005795.

[61] *Id.*

14

superior to the Georgetown loan.[62] When Davenport heard about the term sheet from Tokyo Electron, he crowed in an email to the Georgetown team that Rippert "knows that with our blocking rights we control Basho. Therefore, everything he does is geared toward taking those rights. Nice try but we outflanked him months ago."[63]

Davenport wanted the Company to accept Georgetown's loan offer, decline the Tokyo Electron investment, and enter into a reseller agreement with Tokyo Electron. Galleher told Rippert not to pursue the Tokyo Electron investment unless he could convince Davenport to support it.[64]

Knowing that Davenport wanted to sell the Company, Galleher proposed to hire Greg Collins as a consultant to help prepare Basho for a sale. Collins had decades of experience providing M&A-focused advisory services in the technology sector and had held senior roles at large companies where he had led and executed acquisitions.[65] Collins had joined the Board in May 2012.[66]

---

[62] *Id.* at Fotos 0005793.

[63] *Id.*

[64] *Id.*

[65] *See* Collins Tr. 4-7.

[66] *See* PTO ¶ 19. The record seems to support the notion that Basho created an eighth Board seat for Collins. I have not been able to discern from the record when Larsen left the Board. Galleher's testimony seemed to contemplate that David Ross, who was listed as a director for the meetings in October 2012, had stepped into Larsen's seat. As of October 2012, the Board appears to have consisted of Rippert, Galleher, Brewer, Thornley, Collins, Ross, Davenport, and Reisley. *See* JX 39; Galleher Tr. 174.

15

Galleher worried that Rippert would leave if Basho hired Collins and that his departure would hurt the sale process. Davenport dismissed his concerns.[67] Davenport told Galleher that they needed "to be prepared to take whatever action is necessary to protect our financial interest" and that Rippert "does not understand what I will do to protect our interest and how his 30 year career and net worth will be put in grave jeopardy."[68]

As Galleher feared, Rippert resigned after Basho hired Collins. During a meeting on October 29, 2012, the Board accepted Rippert's resignation, appointed Collins to the positions of President and CEO, and authorized Basho to enter into a loan agreement with Georgetown.[69] Everyone understood that draws under the loan would be "[a]vailable to the Company at $1.5 million monthly."[70]

## E. The Georgetown Loan

In November and December 2012, Reisley and Collins negotiated the documentation for the Georgetown loan. Just before the start of the negotiations, at Georgetown's request, Basho entered into a consulting agreement with Reisley's company, Evergreen Capital.[71] Basho committed to pay Evergreen Capital a fee of $15,000 per month

---

[67] JX 42 at EPG-0007346.

[68] *Id.* at EPG-0007347.

[69] *See* JX 45; *see also* Collins Tr. 10-11.

[70] JX 50 at 4; *see also* JX 759.

[71] Galleher Tr. 179-81; Reisley Dep. 8-9.

16

in return for advice about raising money and selling the company.[72] Despite being paid by Basho, Reisley reported directly to Davenport.[73]

Basho also formally engaged Cowen.[74] The engagement letter covered both selling the Company and raising financing. By this point, Davenport already had been consulting with Cowen for three months.[75]

During a meeting on December 16, 2012, the Board approved the terms of the Georgetown loan, which were subsequently memorialized in a Senior Secured Convertible Note Purchase Agreement (the "Loan Agreement").[76] The agreement authorized maximum borrowings of $7.5 million. Basho could draw up to $1.5 million per month by making a loan request, which Georgetown committed to fund within fifteen days.[77]

With the loan in place, Davenport no longer worried about the Tokyo Electron investment undermining Georgetown's control. At the same meeting that the Board approved the Loan Agreement, the Board approved an investment of $3.75 million from

---

[72] JX 47.

[73] Reisley Dep. 7-9.

[74] PTO ¶ 25; JX 48; Collins Tr. 10.

[75] Davenport Tr. 524-25.

[76] JX 51; *see* PTO ¶ 24.

[77] JX 51 § 3; *see* JX 50 at BTH00026440; JX 66 at REISLEY 026136.

17

Tokyo Electron on terms comparable to the terms of the Series F preferred stock.[78] The

Company and Tokyo Electron also entered into a distributor agreement.[79]

## F. Cowen Tries To Sell The Company.

During the first quarter of 2013, Cowen searched for a buyer for the Company.

Davenport decided that Georgetown "need[ed] to drive this process," and Fotos agreed that

Collins and other members of management would not be willing to give a buyer "the really

hard sell."[80] Davenport began restricting calls with Cowen to Georgetown personnel only.[81]

Reisley told Cowen to interact only with Georgetown personnel and not to call Collins

without getting approval from Georgetown.[82] Davenport made it clear that he wanted to

freeze out Collins and Galleher.[83]

In May 2013, Cowen's ability to perform its engagement was briefly hampered

when the firm fired its M&A team.[84] Evidencing Cowen's loyalty to Georgetown, Cowen

promptly notified Reisley of this development and only told Collins later, after getting

---

[78] JX 50 at BTH00026435.

[79] *Id.* at BTH00026439.

[80] *See* JX 60 at REISLEY 010347-48; *see also* Davenport Tr. 566-67.

[81] *See* JX 59; Collins Tr. 13-15; Davenport Tr. 569-70.

[82] JX 60 at REISLEY 010347; *see* JX 76 at REISLEY 009014.

[83] JX 75 (Davenport writing that he had "no intention to have Greg or Earl involved with [Georgetown's] strategy"); *see* Davenport Tr. 569-72.

[84] *See* JX 73; Davenport Tr. 567.

18

Georgetown's permission.[85] Collins confronted Davenport about being cut out of the sale process, but Davenport ignored him. Davenport told Reisley that the management team needed to understand that he was in charge: "Decisions will be made that they don't like and I will take full responsibility for making those decisions . . . . I want [the management team] to understand that we are in a full pivot and if they do not produce what we need to exit we will be ruthless."[86]

Davenport spoke with his contacts at Cowen about the departure of the M&A team. To remedy matters, Chris McCabe, the co-head of investment banking at Cowen, and Setch Subudhayangkul, a managing director with almost two decades of M&A experience, took over the Basho account. Basho was a small engagement, and Cowen's prompt staffing of the matter with these senior professionals evidenced the firm's loyalty to Georgetown. The new team performed competently, but the sale process failed to generate any results.[87]

## G. Georgetown Fails To Provide Funding Under The Loan Agreement.

When the Board approved the Loan Agreement between Georgetown and Basho, the Board and management understood that Basho could draw on the loan at a rate of $1.5 million per month to fund the Company's needs for operating capital. Georgetown was obligated to fund Basho's requests within fifteen business days. Georgetown only fulfilled the first draw request per the Loan Agreement's contractual terms:

---

[85] JX 76 at REISLEY 009014.

[86] *Id.*

[87] *See* JX 93 at BASH0001581-82.

19

- On April 11, 2013, Basho made its first draw request. Georgetown funded the request on May 2.

- On May 23, 2013, Basho made its second draw request. Georgetown did not fund the request until July 11.

- On July 11, 2013, Basho made its third draw request. Georgetown did not fund the request until September 4.

- On September 9, 2013, Basho made its fourth draw request. Georgetown funded $600,000 on October 22 and funded the remaining $900,000 on November 4.[88]

Davenport personally decided to delay funding the draws under the Loan Agreement as a way "to force Management to cooperate with [Georgetown]."[89]

---

[88] *See* JX 782.

[89] JX 83. At trial, Davenport testified that Georgetown funded the draws based on its counsel's interpretation of the Loan Agreement. Under that supposed interpretation, once Georgetown funded one request, it did not have to fund another for 60 days. Davenport Tr. 535-36, 551-52, 554. Although Davenport got his counsel to say that, the interpretation was so extreme and contrary to the parties' understanding that it could not have been advanced in good faith. Collins thoroughly rebutted Georgetown's arguments. *See* JX 82; Collins Tr. 37-40; *see also* Dkt. 274 (defendants' litigation counsel acknowledging at post-trial argument that he "had difficulty understanding [Georgetown's transactional counsel's] interpretation"). Georgetown's internal description of the Loan Agreement matched Basho's interpretation. *See* JX 759; JX 66 at REISLEY 026136; Reisley Dep. 114-15. The only other investor in the note funded every thirty days. *See* JX 782; Collins Tr. 37-38. Davenport simply chose not to comply with Georgetown's obligations as a means of putting pressure on the Company. *See* JX 83; JX 84 at REISLEY 030491; *see also* JX 126 at Davenport 0013958 (Davenport later claiming to an investor in Basho that Georgetown had no obligation to provide funding under the Loan Agreement). Davenport also testified that Reisley decided how to handle the loan, but Davenport explicitly told Reisley not to comply with the draw requests and to refer any inquiries to Davenport. *See* JX 83. It is difficult to be understated about Davenport's lack of credibility on this issue and on other matters.

Rather than complying with Georgetown's contractual obligations, Davenport told Basho's CFO, Marisa Linardos, that Georgetown would evaluate Basho's funding needs on a monthly basis and provide funds at its discretion.[90] This diktat resulted in Linardos meeting with Reisley to justify the uses of the funds that comprised each draw request. If Reisely disagreed, Georgetown would not fund.[91] Georgetown's micromanagement of Basho's operations caused Basho to miss its third and fourth quarter forecasts.[92]

## H.    Georgetown Controls The Fundraising Process.

Beginning in May 2013, Davenport instructed Cowen to broaden its efforts to include raising a Series G round. Just as he had cut Collins and Galleher out of the sale process, he also maneuvered to cut them out of the fundraising process. In an email to Reisley, he explained the plan:

> I will call Earl [Galleher] tomorrow as a preemptive tactic. Since Cowen has agreed to get our approval on all matters related to the Private Placement prior to any discussion with Management, the following is how we will proceed[.]
>
> 1.    Cowen will work with Greg [Collins] to give him the impression that he is leading the decision making Process
>
> 2.    We will avoid giving the impression in any way that we are contacting or meeting with Cowen independent of what Greg thinks he is doing.

---

[90] *See* Galleher Tr. 192-93; Linardos Dep. 21-25; Thornley Dep. 41-42.

[91] Linardos Dep. 23-24.

[92] *See* JX 215; JX 244; JX 304 at Davenport 0013213; Collins Tr. 72-73.

> 3.      Greg is leading the process as CEO and we are available if he feels he needs our input on anything.
>
> 4.      Cowen's contact for all matters related to the Private Placement will be Greg . . . .[93]

Put simply, Davenport and Reisley misled a fellow director (Galleher) and the Company's CEO (Collins) to achieve Georgetown's goals.

On June 5, 2013, Davenport sent an email to Reisley in which he explained that if they could not sell the Company, then they would bring in a new investor to solidify their control over Basho:

> We will work with Cowen to find an investor who will take Earl [Galleher] off of the payroll. Next we will find an investor that will work with us to get control of the BOD. Together with the new investor we will fire Greg [Collins] and find a real growth focus[ed] CEO. Cowen will work with us to help accomplish our goal[.] They know that Earl and Greg are hostile to them which is good for us. We will welcome Earl and Greg to the realities of Wall Street. Let the fun begin[.][94]

On June 6, Davenport gave Galleher "a harsh and vile tongue lashing" to make it "clear that the nature of the relationship had changed."[95]

Collins perceived that Davenport was trying to cut him out of the fundraising process and attempted to exert his authority as CEO. In an email dated June 16, 2013, Collins instructed the Cowen team to

---

[93] JX 80; *see also* Davenport Tr. 563-64, 569-70.

[94] JX 86 at REISLEY 008987; *see also* JX 87 (Davenport: "Greg [Collins] is a mediocre small minded failure. We need to take control of this Company and Greg and Earl [Galleher] will be history.").

[95] JX 89; *see id.* ("I want [Galleher] to twist slowly in the wind.").

let [him] know immediately of any communications between any of [the Cowen team] and any of Basho's investors or Board members. To be clear, I expect no communication one on one, given the preferential treatment provided to certain investors earlier in the process. Continuation of that approach could prejudice other Board members against our process—something I'd like to avoid.[96]

On June 17, as Collins had expected, Reisley asked Cowen to give Georgetown a contact list for potential investors.[97] Cowen gave the information to Georgetown.[98]

By August 15, 2013, Cowen had reached out to eighty-four financial and strategic investors, held meetings with seventeen investors, and executed non-disclosure agreements with sixteen investors.[99] When the process came to a conclusion in September, only one investor—Battery Ventures—submitted an expression of interest.[100] By early October, Battery Ventures had dropped out because Basho was too far along in the growth cycle, faced significant competition, and lacked a sufficiently mature and predictable market.[101]

---

[96] JX 91 at COWENBASHO00020094.

[97] *See* JX 92; *see also* Subudhayangkul Dep. 21.

[98] *See* JX 94; JX 96; *see also* Subudhayangkul Dep. 25-28.

[99] *See* JX 100 at BASH008839.

[100] *See* JX 109; Subudhayangkul Dep. 38-39.

[101] *See* JX 124 at BASH012317; Collins Tr. 82-83. At trial, Fotos testified that Battery walked away from the investment because Collins announced in an investment pitch that Basho would miss its third quarter projections by a wide margin. Fotos Tr. 753-54. That testimony was not credible, conflicted with Collins' contemporaneous account and testimony, and seems to have been manufactured based on another email in the record. *See* JX 215.

Under its budget, Basho expected to need more funding by the end of the year. With few options left, Cowen reached out to Norvell Miller, the Managing Director of Southeast Venture Partners.[102] Galleher had identified Southeast as a possible investor and met with Miller in August, but Miller had deferred engaging in any discussions while he completed other deals.[103] Miller also told Galleher that Southeast's preliminary research on Basho "had raised a yellow flag about [its] possible involvement with Mr. Davenport" because of his history of litigation and lack of experience with technology companies.[104] After engaging in October, Miller spoke with Collins and told him that Southeast only would invest if they could establish "a working relationship" with Davenport.[105] Collins relayed the information to Davenport and suggested that he and Miller speak with each other directly.[106]

Miller told Davenport that Southeast was prepared to consider an investment at a pre-money valuation of $100 million. Davenport responded that Georgetown was about to submit its own term sheet and that Southeast should consider participating in that

---

[102] JX 120; *see* PTO ¶ 26. Miller also led Southeast Interactive Technologies. The parties did not always distinguish carefully between Miller's two entities. The distinction is not important for this decision, which refers to both as "Southeast."

[103] Galleher Tr. 200-01.

[104] Collins Tr. 22.

[105] JX 139; *see* 1 Miller Dep. 14-17. Miller's deposition transcript comprised two, nonconsecutively paginated volumes. To differentiate, this decision employs the citation style for multi-volume treatises.

[106] JX 138.

investment. Miller explained that Southeast could act more quickly by submitting a term sheet of its own, but Davenport reiterated that Southeast should consider Georgetown's term sheet first.[107] Davenport did not want to compete with Southeast. He wanted to be able to extract advantageous terms from the Company and recognized that he could best achieve that goal if Georgetown was the Company's only option. He hoped Southeast would be happy to ride Georgetown's coattails and invest on the advantageous terms that Georgetown could extract if the Company lacked alternatives.

To reduce the risk that Southeast might compete, Davenport tried to slow down Southeast's ability to prepare its own term sheet. On November 2, 2013, Davenport told Miller that Reisley was in charge of drafting Georgetown's term sheet and that the two should speak.[108] Miller scheduled a call with Reisley, but Reisley skipped it without ever following up or explaining why.[109]

Also during October 2013, Georgetown met with NewSpring Capital, another venture capital firm.[110] NewSpring proposed a framework for a joint investment, but Reisley found it unacceptable because it was "too attractive to the new investors and not

[107] *See* JX 141.

[108] JX 144 at BASH012290.

[109] JX 147 at BASH017581; *see also* Collins Tr. 25-26; 1 Miller Dep. 20; Reisley Dep. 178-79.

[110] *See* JX 131.

25

sufficiently attractive to us."[111] Davenport worried that the investment would prevent Georgetown from achieving "total positive control" over Basho.[112] When Reisley told NewSpring that Georgetown was submitting a term sheet without them, NewSpring withdrew.[113]

### 1. Georgetown's Series G Term Sheet

On November 4, 2013, Georgetown sent Basho a term sheet for the Series G round.[114] It contemplated a total investment of $20 million at a pre-money valuation of $75 million. Georgetown committed to invest $10.025 million, but only $2.575 million was new money; the other $7.45 million would come from converting the amounts due under the Loan Agreement. If Georgetown could find other investors to fill out the round, then the Company would receive a total of $12.55 million in new money.[115]

The terms of the Series G preferred stock were onerous: a liquidation preference equal to three times invested capital, a cumulative dividend of 8%, the ability to convert the preferred stock into super-voting common stock that carried ten votes per share, the

---

[111] JX 136 at REISLEY 015857.

[112] JX 143; *see also* Fotos Tr. 751, 786.

[113] *See* JX 145; JX 148 at Davenport 0027943; Fotos Tr. 751. Cowen knew about the discussions with NewSpring. *See* JX 151 at REISLEY 016692. Neither Georgetown nor Cowen ever told Galleher about the discussions, which he learned about during this litigation. Galleher Tr. 345-46.

[114] PTO ¶ 33.

[115] JX 146.

26

right to designate five out of the seven members of the Board, and extensive blocking rights. In addition, Georgetown would designate counsel to document the deal, Basho would pay all of the expenses related to the deal, and Basho would extend Evergreen Capital's consulting agreement until Georgetown elected otherwise.[116]

Georgetown demanded an answer by November 7, 2013—72 hours later.[117] Collins asked Georgetown for additional time to evaluate the proposal; Georgetown refused.[118] On the evening of November 6, the Board met to discuss the term sheet.[119] Reisley and Davenport insisted on being present for the discussions, although they agreed to abstain from any vote.[120] The Board countered by establishing a committee whose members were Galleher, Collins, and Thornley and empowering the committee to consider the investment.[121] After deliberating in committee, they decided that the term sheet was too one-sided and should be rejected.[122]

Rather than negotiating, Georgetown applied more pressure. Davenport threatened to stop providing any funding under the Loan Agreement by claiming that Basho had

---

[116] *Id.* at COWENBASHO00026672; *see* Galleher 213-14.

[117] JX 831 at BASH006490; Collins Tr. 26.

[118] *See* JX 154 at COWENBASHO00014992; Collins Tr. 26.

[119] JX 158.

[120] JX 155.

[121] PTO ¶ 35; JX 158 at BTH00012758-59.

[122] PTO ¶ 36; JX 159 at BTH00028049; Collins Tr. 33-34.

suffered a material adverse change.[123] He also told Collins that he should not expect any funding from Southeast and that Georgetown's deal would only get worse if the Company did not accept it.[124]

At this point, Collins concluded that the Company "had no path forward but to proceed with approval of the term sheet."[125] On November 7, 2013, the committee changed its position and recommended that management be authorized to negotiate definitive transaction documents with Georgetown.[126] The Board followed the committee's recommendation.[127]

### 2. Southeast Submits A Competing Term Sheet.

On November 10, 2013, Collins forwarded Georgetown's term sheet to Miller in hopes of securing a better offer. Miller indicated that Southeast's partners were prepared invest $15 million, subject to due diligence and an agreement on terms.[128] The next day, Miller spoke with Davenport. A string of pejorative texts that Davenport sent to Reisley

---

[123] JX 160-61; *see* JX 167; Collins Tr. 34-35; Galleher Tr. 222-24; Davenport Tr. 437-38; Linardos Dep. 53-56; Thornley Dep. 69-6.

[124] JX 166.

[125] Collins Tr. 41-42; *see also* JX 159.

[126] PTO ¶ 36; *see* JX 159; JX 160; Thornley Dep. 61-68; Collins Tr. 30-34.

[127] Collins Tr. 42.

[128] JX 170 at BTH00022988; 1 Miller Dep. 45-48.

28

indicates that Davenport had no intention of cooperating with Miller.[129] The following day, Miller told Galleher and Collins that he was "getting mixed signals from everyone."[130]

On Thursday, November 14, 2013, Miller told Davenport that Southeast was considering investing between $8 and $15 million.[131] Galleher proposed to delay any deal with Georgetown until after Southeast made its proposal.[132] On Friday, November 15, Davenport told Collins that Basho needed to sign Georgetown's deal by Wednesday, November 20, or he would sue Collins personally.[133] Davenport also threatened to sue Galleher personally.[134] Meanwhile, Georgetown stopped providing any additional funding under the Loan Agreement. Reisley told Linardos to conserve cash by stretching out vendor payments.[135] Collins became so frustrated that he tendered his resignation on November 19, but withdrew it after Galleher and Thornley asked to him reconsider.[136]

---

[129] JX 173.

[130] JX 175.

[131] JX 180; 1 Miller Dep. 30.

[132] JX 181 at BTH00023007.

[133] JX 182; JX 421 at BTH00046221; Collins Tr. 16-17, 44-45; *see also* JX 224 at BTH00028237.

[134] JX 198 at COWENBASHO00016031; *see* JX 186; 421; Galleher Tr. 222, 292.

[135] *See* JX 176 at REISLEY 026511-12.

[136] JX 192; Collins Tr. 49.

On November 21, 2013, Southeast sent a term sheet to Collins.[137] Southeast proposed investing $12.5 million in cash plus a commitment to invest another $10 million if the Board determined that additional funding was required. Southeast would receive preferred stock carrying a liquidation preference equal to two times invested capital. The post-investment Board would have nine seats: holders of the Series G preferred stock would designate five seats (with Southeast designating two of the five), holders of the Series A-F preferred stock would designate one seat; and the remaining seats would be reserved for Basho's CEO, Galleher, and one outside director selected by a majority of the other directors. The preferred stock would accrue a 5% cumulative dividend that would be paid out only upon sale or liquidation.[138]

Cowen immediately recognized that Southeast's term sheet was superior to Georgetown's proposal.[139] At trial, Davenport conceded this point.[140]

That night, Collins sent Southeast's term sheet to Davenport and the other directors.[141] Brewer reacted positively.[142] Galleher felt that Basho needed a bridge loan if

---

[137] PTO ¶ 27.

[138] JX 195.

[139] *See* JX 222; JX 270.

[140] Davenport Tr. 598.

[141] JX 203; JX 207.

[142] JX 207 at EPG-0007501.

30

Georgetown refused to continue funding under the Loan Agreement, but that if Southeast added that feature, then the Board would likely accept Southeast's proposal.[143]

Davenport was unimpressed with Southeast's offer. He emailed his team: "This is their Hail Mary Play? Let's play along with them until time runs out."[144]

As Davenport's email suggested, he recognized that if he could delay a potential deal with Southeast and create uncertainty about its ability to close, then the Company would find itself desperate for money. At that point, Georgetown would be the Company's only option. Consistent with this plan, Davenport and Reisley spent the next two months communicating a series of conflicting and confusing positions to Southeast and the Company. At times, superficially, they expressed support for a Southeast deal. Meanwhile, they would ignore requests for information, decline to respond to substantive proposals, and otherwise adopt passive-aggressive stances. At other times, Davenport and Reisley would be openly hostile and aggressive towards Southeast or critical of Company management.[145]

Internal dynamics at Southeast further complicated matters and helped Davenport and Reisley achieve their aims. Southeast was not an investment fund with committed

---

[143] JX 198 at COWENBASHO00016031.

[144] JX 210 at REISLEY 030288.

[145] *See, e.g.*, JX 217; JX 219 at COWENBASHO00016500; JX 225; JX 226 at COWENBASHO00022216; JX 234 at COWENBASHO00022398; JX 247 at COWENBASHO00022541; JX 249 at COWENBASHO00022596; JX 253; JX 260; JX 261; JX 277 at BTH00015759-60.

31

capital. Instead, it was a pledge fund with a stable of investors. Southeast presented transactions to its investors on a deal-by-deal basis, and each investor decided whether or not to participate.[146] Two of Miller's significant investors were Rutherford Seydel and Tom Noonan. For the Basho investment, Noonan's involvement was particularly important because of his experience with technology companies.[147]

During the discussions about Basho, the complexities of both sides' internal structures meant that neither side could speak with one voice. Instead, the multiple players produced awkward, complex, and confusing interactions involving varying combinations of Miller, Noonan, Seydel, Collins, Galleher, Davenport, Reisley, and other members of the Board. Matters became even more complicated because Miller was not able to discuss the deal in detail with Noonan until late December 2013.[148]

For Davenport and Reisley, the chaotic situation perfectly suited their goal of delay. They could say different things to different people, appear supportive in some communications and antagonistic in others, and generally run out the clock while claiming all along that they were trying to cooperate.

---

[146] JX 264 at COWENBASHO00023996 (Cowen noting that Southeast "is unique in the sense that you syndicate on a deal by deal basis"); Reisley Dep. 169-70.

[147] Collins Tr. 24-25, 63-64; Davenport Tr. 598-99; *see* 1 Miller Dep. 44.

[148] *See* JX 314 at Davenport 0001727.

### 3. The Southeast Deal Falls Apart.

On November 22, 2013, Miller told Cowen that his partners had verbally committed to the deal.[149] Miller also thought the request for a bridge loan would be approved.[150] In an email to his partners, Miller credited Georgetown's greed with creating an attractive opportunity:

> We have been negotiating a term sheet with management and Cowen, after the Davenport Group (the current largest investor) put in a term sheet that was so pun[i]tive that management will likely quit. We are the beneficiary of that term sheet, as we only had to move modestly to the right to be perceived as the "white knight". Steve Rakes, my dour partner, calls this the best deal he has seen in his career, and is planning to personally participate.[151]

In reality, Miller did not yet have commitments from Noonan and Seydel, who were his key investors for the Basho transaction.

During a meeting on November 22, 2013, the Board instructed Cowen to work with Southeast on the details of transaction.[152] Davenport and Reisley abstained from the vote.[153] That evening, Davenport texted Thornley and accused Galleher of "actively working to delay the approval process" for Georgetown's deal.[154] He told Thornley that Basho "will

---

[149] JX 208 at COWENBASHO00016213.

[150] *Id.*

[151] JX 206 at 1; *see also* 1 Miller Dep. 39-40, 88; 2 Miller Dep. 20.

[152] PTO ¶¶ 29.

[153] *Id.*

[154] JX 184.

be insolvent" and "this could end badly" unless Basho closed its financing promptly.[155]

After talking with Thornley, Davenport reported to his team at Georgetown:

> I had a "come to Jesus" call with Thornley. I told him I was I [sic] tired of him taking sides with [Collins] and [Galleher] and their attacks on us. I resented what he did today and if he did it again I will treat him as an enemy. He believed everything that they said and believed nothing I said. I [y]elled at him for two minutes and would not let him say anything. I told him I use[d] to respect him but not any longer. I told him that all of this was personal and all we respect is business. I told him that we want total control and the best interest of [Basho] would be served when [Collins] leaves [Basho] and was happy he resigned. He has missed every BOD approved budget and more importantly the BOD he gave the banker when they asked him to give them a Budget that he was sure he would make [sic]. We had money at stake and he has nothing. I am upset with him and do not feel he can be trusted. THE END.[156]

When asked whether Thornley would support Georgetown, Davenport responded, "If we put this last $4M in I want total control and do not care what his attitude. If I do not like his attitude or actions I want the power to crush him."[157]

Despite his actual views, Davenport feigned willingness to support Southeast's term sheet.[158] He had Cowen propose that Basho close on Georgetown's investment first, then Georgetown would roll its investment into Southeast's when Southeast was ready to close in January.[159] The idea that Georgetown voluntarily would give up its superior security in

---

[155] *Id.*

[156] JX 216; *see also* Davenport Dep. 185-87.

[157] JX 216.

[158] *See* JX 217.

[159] JX 219 at COWENBASHO00016500.

34

order to roll into Southeast's weaker security was not credible, and Galleher understandably rejected the idea.[160]

On November 26, 2013, Miller submitted a revised term sheet in which he agreed to changes requested by Georgetown and Cowen.[161] Miller expected Basho to accept the deal.[162] He also believed that Georgetown had agreed to continue to fund its commitments under the Loan Agreement so that Southeast would not have to provide bridge financing.[163] Davenport likewise told Basho that he would not let the Company run out of funds.[164]

Three hours later, Davenport bluntly rejected Southeast's term sheet, stating: "[W]e think that this approach is not productive, therefore we do not have any comments on the draft term sheet."[165] Miller decided "to go pencils down" rather than entering a "hostile environment."[166] Davenport blamed Miller, accusing Southeast of lacking the capital to fund the deal and claiming that Miller had failed to consider that Basho would have to pay off its loan from Georgetown in December 2014.[167] The first accusation had a germ of truth

---

[160] JX 221.

[161] PTO ¶ 30; 1 Miller Dep. 60-69.

[162] JX 228 at SEY000133.

[163] *Id.*

[164] *See* JX 229.

[165] JX 233; *see also* 1 Miller Dep. 69-70.

[166] JX 234 at COWENBASHO00022398-99; *see also* 1 Miller Dep. 70-73.

[167] *Id.* at COWENBASHO00022398.

35

in light of Southeast's structure, but Miller had never hidden that fact and had represented that his investors would fund the deal. The second accusation came out of the blue, because the discussions had always contemplated Georgetown rolling the debt owed under the Loan Agreement into the equity raise. Miller told Collins that Davenport had never mentioned this point before.[168] Davenport's unprofessional communication echoed Reisley's treatment of Southeast, which Miller described as "obstinate, and non-responsive" to the point that Southeast would "never speak to him again."[169]

Less than a week later, on December 1, 2013, Davenport changed his tune once more. This time, he told Cowen that Georgetown would either let Southeast lead a standalone deal or work with Southeast on a combined deal.[170] Davenport also committed to fulfill Georgetown's commitments under the Loan Agreement and requested a face-to-face meeting with Galleher to clear the air.[171] When the two met, Davenport told Galleher that if Southeast could deliver a term sheet that worked for the Company, Georgetown would support it.[172]

---

[168] *Id.*

[169] JX 237 at EPG-0006759; 2 Miller Dep. 20-21.

[170] *See* JX 247 at COWENBASHO00022541; *see also* JX 249 at COWENBASHO00022596.

[171] Galleher Tr. 243.

[172] JX 249; JX 251; Galleher Tr. 243-44.

With Davenport continuing to sound supportive,[173] Miller re-engaged and sent a revised term sheet to Basho on December 6, 2013.[174] It contemplated an investment of $27.5 million at a pre-money valuation of $75 million, plus the possibility of an additional investment of $10 million. It incorporated a $1.5 million bridge loan to fund Basho's immediate cash needs.[175] Collins believed that Miller's principal investors, Noonan and Seydel, had committed to the deal.[176] In reality, they still had not yet agreed to fund the transaction.[177]

On December 9, 2013, the Board approved the terms of Southeast's proposal with Davenport and Reisley abstaining.[178] Although he outwardly remained supportive, Davenport secretly continued to plot ways of disrupting the negotiations with Southeast. In an email dated December 16, 2013, Davenport told Reisley:

> With respect to Basho and [Southeast] my new thought is that we should wait to resolve (or raise) any of our demands until it is too late for the Company and [Southeast] to do a deal with anyone else and the Company is running out of cash.

---

[173] *See* JX 253; JX 260; JX 261.

[174] *See generally* 1 Miller Dep. 86-96.

[175] JX 254.

[176] JX 255.

[177] *Cf.* JX 256 at SEY000181.

[178] PTO ¶ 32; JX 267 at BTH00004239.

My thinking is that we can play [Galleher's] game. After the BOD approves the definitive agreement and everyone thinks the deal is a go we should approve only if we get everything we want.

[Galleher] and [Collins] will be emotionally attached and on the verge of what they will see as a victory for them.

We will win this game of poker[.][179]

Galleher correctly perceived at the time that Davenport was purposefully sending conflicting messages and claiming to be supportive while in fact being non-cooperative.[180]

By late December 2013, Southeast was still not ready to close. It turned out that Miller had not yet been able to convince Noonan to support the transaction. To gain more time, Miller offered to provide $1 million of bridge financing.[181] Miller later increased that amount to $1.5 million.[182]

On December 31, 2013, Noonan sent Miller a list of seven objections to the deal.[183] He concluded, "I like the technology, I like the market opportunity, but continue to have

---

[179] JX 273. At trial, Davenport tried to reinterpret his email by claiming he simply "wanted to get the best deal for the company." Davenport Tr. 599-600. That testimony was not credible.

[180] JX 277 at BTH00015761.

[181] JX 288 at COWENBASHO00025946.

[182] JX 289.

[183] JX 303 at 3-5.

anxiety about a series G financing, with Chester, under these terms."[184] After sending the email, Noonan could not be reached for several days.[185]

By January 8, 2014, no significant progress had been made. Galleher wrote to Davenport, noting that "the bridge financing is in some form of limbo" and that Basho was "fast approaching the date of no more money in the company."[186] He asked Davenport to submit a proposal that would:

> 1. Prevent the company from running out of money.
>
> 2. Establishing a deal that all investors (including [Georgetown]) could live with and feel ok about.
>
> 3. Ensure there is not a management exodus from the company[.]
>
> 4. Provide for a condition wherein management has the runway to actually build the business vs. being ever focused on our cash run out date.
>
> 5. Be something that could attract the strategic investors whom we want to quickly bring into the company.[187]

This was the scenario that Davenport had sought to create. Knowing that the Company was desperate, Davenport did not budge from Georgetown's original Series G term sheet.

On January 10, 2014, Basho sent Davenport a counterproposal.[188] It contemplated a Series G round in which Georgetown would invest a total of $10 million, consisting of $2.5

---

[184] *Id.* at 5.

[185] *Id.* at 2-3.

[186] JX 308 at BASH0001530.

[187] *Id.*

[188] JX 310.

million in new money and the conversion of $7.5 million advanced under the Loan Agreement. The counterproposal anticipated another $12.5 million from a combination of Southeast and other investors.[189] The term sheet was aspirational, because neither Southeast nor any other investors were committed.[190]

That same day, Collins met with Noonan and Seydel and their advisors.[191] He reported to Galleher and Davenport that Noonan and Seydel were "prepared to proceed with a bridge and Series G financing," but "under materially different terms than outlined in the current documents."[192] Collins outlined the main points, which included:

a) Substantial reduction if not elimination of all non-Series G liquidation preference.

b) Retention of a fully participating 2X series G liquidation preference[.]

c) Series G protection provisions voting threshold shall be increased to require approval of the holders of the Notes[.]

d) Currently outstanding convertible debt held by Georgetown will convert into Series F Preferred Stock at the Series F original purchase price prior to the Series G financing and on a pre-money basis [.]

e) Board must be reduced to no more than 5 directors, constitution tbd.[193]

---

[189] *Id.* at BASH006823.

[190] Galleher Tr. 318-19.

[191] *See* Collins Tr. 68-70; *see also* 1 Miller Dep. 110-13.

[192] JX 314 at Davenport 0001727.

[193] JX 318 at BTH00028303-04. Noonan's revised term sheet is available at JX 801.

Galleher thought the deal was attractive and the only way for Basho to move forward. To facilitate the deal, Galleher offered to give up his right to have any representation on the Board.[194] Davenport thought that Southeast was simply trying to re-trade the deal at the last minute to get better terms.[195]

Davenport and Seydel spoke by telephone on January 12 and 13, 2014.[196] In an effort to establish a positive working relationship, Seydel invited Davenport to be his guest at two social events; Davenport did not attend either.[197] Davenport also spoke by telephone with Noonan on January 13. During the call, Davenport made it clear that (i) he was not happy with the performance of Basho management, (ii) Georgetown only would invest more money if it achieved hard control, (iii) he would not subordinate Georgetown's debt under the Loan Agreement, and (iv) he would not reduce Georgetown's liquidation preference.[198] The call gave Noonan serious doubts about the investment, but he remained undecided.[199]

---

[194] JX 317 at Davenport 0013009.

[195] JX 320.

[196] JX 325 at BASH014914.

[197] *See* JX 323; Davenport Tr. 623.

[198] JX 328 at SEV-TN 002894-95.

[199] *Id.* at SEV-TN 002894.

After the call, Davenport spoke with Galleher and told him (falsely) that he and Noonan had not talked about investment terms.[200] Galleher then did some digging on his own. On January 14, 2014, Galleher had a heated exchange with Davenport. He then emailed his fellow directors and told them that Noonan had not completed the bridge financing because of concern about Georgetown as an investor.[201] Davenport called Galleher's comments "libelous."[202] Galleher asked for a Board meeting to discuss the matter. Later that day, Davenport and Galleher had a conversation in which Davenport reversed position again and committed to work with Seydel and Noonan to support a bridge financing. Galleher postponed the Board meeting in hopes that a deal with Southeast would finally work out.[203]

After conferring with his team at Georgetown, Davenport relayed a revised proposal to Galleher. Galleher's notes memorialized the terms:

> 1. Chester is willing to extend the current Note agreement of $7.5m to approx. $8m to address immediate cash needs. He would fund the $500,000 deficit on Monday, Jan 20. He said if the needs were a little higher, her would be willing to do that… so let's say up to $650k or so.
>
> 2. At close of round, Basho pays off $7.5 million (now say $8m to $8.250m from immediate cash needs advance) note with funds raised through G round.

---

[200] JX 332 at BTH00016088-89; *see also* Davenport Tr. 633-35.

[201] JX 330 at Davenport 0001725; Galleher Tr. 318-22.

[202] JX 330 at Davenport 0001725.

[203] JX 334 at REISLEY 035116.

3.      He would request that his $13m passive investment be treated fairly, like all early investors investments and not be wiped out.

4.      He would release all blocking rights.

5.      He would retain his 2 BOD seats.

6.      He would cooperate with our efforts to bring in Noonan and [Seydel].[204]

Davenport claimed that he could convince Noonan and Seydel to accept these terms.[205] I do not believe that Davenport had any intention of proceeding with a deal on these terms. I think he was stringing out the negotiations to increase the pressure on the Company.

On January 17, 2014, Miller reported that Noonan would not participate in the financing.[206] With Noonan out, the Southeast proposal fell through.

After hearing the news, Collins resigned from all of his positions with the Company.[207] Galleher did not believe that the Company could make its next payroll.[208] Davenport had maneuvered the Company into a position of maximum crisis.

## I.      The Series G Round Closes.

At 10:40 pm on January 17, 2014, Reisley sent the Board a revised proposal for the Series G round and demanded an answer by January 18, 2014 at 6:00 pm—19 hours and

---

[204] JX 336 at Davenport 0001673; *see also* Davenport Tr. 637-40.

[205] JX 336 at Davenport 0001672.

[206] JX 341.

[207] PTO ¶ 39; Collins Tr. 71; Galleher Tr. 264.

[208] JX 346 at REISLEY 035070.

20 minutes later.[209] Galleher replied with questions that he believed Georgetown should answer.[210] Georgetown ignored them.

The revised proposal increased the size of the total round from $20 million to $25 million. Georgetown still committed to fund only $10 million, and only $2.5 million was new money; Georgetown's remaining $7.5 million continued to come from the conversion of amounts due under the Loan Agreement.[211] No other investors had been lined up to participate. In light of Davenport's persistent criticisms about Southeast being a pledge fund, this aspect of Georgetown's proposal carried considerable irony: Georgetown did not have the investors to back its proposal either. And unlike Southeast, which would have lined up its investors before closing and funded the total round, Georgetown's deal would close first, then Georgetown would go out into the market to try to find more investors.[212]

Georgetown had modified other aspects of its proposal. The Series G security remained participating preferred stock that earned a cumulative dividend of 8% per annum. The shares remained convertible into a new class of common stock carrying ten votes per share. Georgetown still controlled a majority of the post-transaction Board, although now with the right to designate four out of seven seats rather than five out of seven. The main changes were in the liquidation preference. Rather than three times invested capital, the

---

[209] JX 343; Galleher Tr. 266; Davenport Tr. 647.

[210] JX 350 at COWENBASHO00026703.

[211] JX 354; *see also* Subudhayangkul Dep. 142.

[212] *See* Subudhayangkul Dep. 137-39; 143-44.

44

shares carried a preference equal to two times invested capital. Evidencing Georgetown's eagerness for a near-term sale, the preference would decline to one times invested capital if a liquidating event generating less than $75 million in aggregate value for all equity holders occurred in 2014. Georgetown demanded irrevocable proxies from Galleher and IDCF that it could vote in favor of the deal.[213]

During a meeting on January 18, 2014, the Board accepted Georgetown's proposal.[214] Brewer did not participate.[215] Davenport and Reisley voted in favor of their proposal. Thornley said he approved it because he felt that the Company had no other options.[216] Ross and Yamanaka went along. Galleher also voted in favor, but only after expressing a lengthy list of objections. He later submitted his objections in writing and instructed that they be filed with the minutes.[217]

On January 23, 2013, Georgetown sent transaction documents to Basho and insisted that they be approved and executed within two hours.[218] Rather than approve the

---

[213] *See* JX 354; JX 376.

[214] PTO ¶ 40; JX 361 at BTH00004246.

[215] JX 361 at BTH00004247.

[216] *See* Thornley Dep. 126; *see also* Galleher Tr. 267-71.

[217] JX 352 at EPG-0006967; *see* JX 359.

[218] *See* JX 373.

45

documents, Brewer resigned from the Board.[219] The Board convened without Brewer and approved the documents.[220]

The initial closing took place that same day, resulting in the issuance of Series G preferred stock to Georgetown (the "Series G Financing").[221] As a result of the issuance, Georgetown gained control over a majority of Basho's outstanding voting power, giving Georgetown mathematical control at the stockholder level. Georgetown also gained the right to appoint a majority of the members of the Board.

On January 24, 2013, the Board met again. At the outset of the meeting, Georgetown designated Fotos as a director.[222] Collins and Brewer had resigned, and although the record is unclear on this point, Ross also left the Board. Adding Fotos resulted in a Board comprising Davenport, Reisley, Fotos, Thornley, Yamanaka, and Galleher. Davenport knew he controlled Reisley and Fotos and expected to control the CEO when that position was filled.[223] Davenport had verbally bludgeoned Thornley to the point where he assented

---

[219] JX 374.

[220] JX 381 at REISLEY 034301.

[221] PTO ¶ 43; JX 381.

[222] PTO ¶ 45; Fotos Tr. 760.

[223] *See* JX 545 at BASH015854; *see also* JX 549.

to Georgetown's wishes;[224] he would resign in a matter of weeks.[225] Yamanaka remained a director, but he was based in Japan and saw his role as a liaison for IDCF.[226] He routinely went along with whatever the Board did. Only Galleher continued to question Georgetown's actions. If Galleher could have rallied Thornley and Yamanaka, which I do not believe was possible, the three of them at most could have created a temporary deadlock until Georgetown appointed a fourth director.

During the meeting, Davenport introduced a series of resolutions that the Board had never seen or discussed.[227] In quick succession, the Board approved the following actions:

- A resolution removing Galleher as Chairman of the Board and appointing Davenport as Chairman. Davenport then renamed this position "Executive Chairman."

- A resolution appointing Davenport, Reisley, and the future CEO as members of the Executive Committee. The resolution empowered the Executive Committee to exercise "all the powers and authority of the Board in the management of the business and affairs of the Company."

---

[224] The Series G Financing listed Thornley as a Georgetown designee to the Board. JX 354. Davenport also represented to others that he controlled Thornley and admitted so at trial. *See* JX 545 at BASH015854; Davenport Tr. 655-56.

[225] *See* Thornley Dep. 149; *see also* Galleher Tr. 279-80 (explaining that Thornley delayed his resignation to reduce the overall disruption to the Company after Collins and Brewer resigned).

[226] *See* JX 19 (IDCF investment memorandum to Basho explaining purpose of investment); JX 357 (Yamanaka's response to crisis over Series G Financing).

[227] *See* JX 383 (Reisley instructing not to distribute resolutions prior to Board call); Galleher Tr. 282.

47

- A resolution appointing Davenport, Reisley, and Thornley as members of the Audit Committee.

- A resolution appointing Davenport, Reisley, and Yamanaka as members of the Compensation Committee.

- A resolution eliminating all committees of the Board except the Executive Committee, the Audit Committee, and the Compensation Committee.[228]

- A resolution engaging a Georgetown affiliate to provide financial and management consulting services to Basho for $200,000 per year.[229]

In each case, the directors approved the resolutions with Galleher abstaining.[230]

On March, 19, 2014, Thornley resigned from the Board.[231] He was the fourth director to leave the Board since Georgetown's final proposal for the Series G Financing, and many senior officers and line employees had left as well.[232] Galleher sent an email to his fellow directors complaining about the situation. The Executive Committee responded by terminating a consulting agreement between Galleher and the Company that paid him $200,000 per year.[233]

---

[228] JX 384.

[229] JX 385.

[230] Galleher Tr. 281-82.

[231] PTO ¶ 46.

[232] *See* JX 444 at BASH0004004. The directors who left the Board were Collins, Ross, Brewer, and Thornley. Collins was also the CEO.

[233] JX 446.

48

Between January 17 and March 10, 2014, the Company lacked a CEO. The vacancy left Davenport and Reisley as the sole members of the Executive Committee.[234] They used their status to run the Company without consulting with or advising the other directors.[235] They took particular delight in freezing out Galleher.[236] They also fired Latham & Watkins LLP, the Company's longstanding outside counsel.[237]

On March 10, 2014, without any input from any of the other directors, Davenport and Reisley hired Adam Wray to serve as Basho's CEO.[238] The plaintiffs proved at trial that although Wray had experience working at technology companies, including as a CEO, he was underqualified for the job, and Davenport an Reisley paid him what was more-likely-than-not an above-market salary given his background and experience.[239]

After Wray joined the Company and became a director, the Board comprised Davenport, Reisley, Fotos, Wray, Yamanaka, and Galleher. Although Georgetown

---

[234] Galleher Tr. 283-84; Thornley Dep. 138-42.

[235] JX 401 at BASH014263.

[236] *See* JX 401 at BASH01426. Galleher also sent out multiple requests for information from the Board and Mark Martines, the Company's then-General Counsel. *See, e.g.*, JX 410; JX 423; JX 427. Davenport ignored them. He even told a personal friend of his, Bianca Sun, that Basho had hired a new CEO before bothering to tell Galleher. JX 428; Davenport Tr. 677-78.

[237] *See* JX 416 at BTH00000693.

[238] *See* JX 436; Galleher Tr. 296-97.

[239] *See* JX 436 at BTH00004434-35; Galleher Tr. 297-98. The plaintiffs also raised questions about Wray's honesty. *Compare* JX 579, *with* Wray Dep. 17.

controlled the first four directors,[240] Davenport and Reisley continued using the Executive Committee to run the show. The Executive Committee did not hold formal meetings or prepare minutes; its members just acted.[241] With the Executive Committee handling everything, the Board did not convene a formal meeting for months.[242] During this period, Wray worked with Georgetown to phase out much of Basho's legacy management team.[243]

Basho continued to need money. When the Series G Financing closed, Georgetown had only provided Basho with $2.5 million in new money. Georgetown thought it would be able to find other investors who would buy Series G shares and provide the remaining $15 million. But Georgetown had little success. Many of the investors lost interest after speaking with Davenport and looking at the Company.[244] By mid-March 2014, Georgetown had managed to raise only $67,500 from other investors.[245]

## J.    A Series Of Insider Transactions

The balance of 2014 witnessed a series of insider transactions. On April 15, 2014, the Executive Committee amended Basho's consulting agreement with Evergreen Capital

---

[240] *See* JX 508; JX 523.

[241] Galleher Tr. 282; Wray Dep. 98-100.

[242] *See* JX 473 at BTH00000661 (noting that as of May 23, 2014, the Board had not met); Galleher Tr. 272, 281-82, 90.

[243] *See* JX 402-03; *see also* JX 437 at WRAY00020565; JX 470; Davenport Tr. 703.

[244] *See* JX 401 at BASH014264; JX 409 at BASH014203.

[245] JX 442 at BTH00004450.

to extend it indefinitely, subject to termination on thirty-days' notice. To compensate Evergreen Capital for the remainder of 2014, Evergreen Capital would receive 102,040 shares of Series G preferred stock plus nine monthly payments of $3,888.88 in cash. In future years, the agreement would revert to a payment of $15,000 per month.[246]

On April 23, 2014, the Executive Committee approved a $650,000 loan from Georgetown, payable on demand.[247] The loan would bear interest at 5% per annum, but the rate would increase to 7% if the Company failed to pay on demand. The outstanding balance could be converted into Series G shares at any time or rolled into equity in the next financing round.[248]

Georgetown was still having difficulty filling out the Series G round, so the Executive Committee hired PGP Capital Advisors, LLC.[249] They did not have much success either. Among other things, investors balked at Georgetown's insistence on vetting every investor before they could speak with management.[250] With his options dwindling, Davenport emailed Seydel to invite him to participate, but Seydel did not respond.[251]

---

[246] JX 455.

[247] JX 459 at BTH00004468-69.

[248] *Id.* at BTH00004473-74.

[249] *Id.* at BTH00004469-70.

[250] JX 503 at 1.

[251] *See* JX 507 (soliciting investment); JX 512 (following up on email sent a few weeks earlier); JX 515 (following up on voicemail Davenport left Seydel). At trial, Davenport testified that he spoke to Seydel often and they communicated about a potential

51

On June 27, 2014, the Executive Committee approved a loan of $1.5 million from defendant Newport Beach Investors, LLC ("Newport"), an entity that Davenport controlled.[252] The terms of the loan paralleled Georgetown's loan in April 2014.[253]

As of mid-July 2014, no one other than Davenport, his affiliates, and a handful of existing investors in Georgetown had invested in the Series G round. On August 22, the Executive Committee approved another loan from Newport in the amount of $250,000.[254] On September 12, the Executive Committee approved yet another loan from Newport in the amount of $400,000.[255] The terms were the same as the June loan.

In late September 2014, after Galleher indicated that he would file a lawsuit seeking books and records, Reisley began reaching out to other members of the Board about ratifying the actions taken by the Executive Committee.[256] On October 24, the Board met for the first time since January.[257] During the meeting, the Board ratified the employment agreements for Wray and another senior officer, as well as certain employee retention

---

investment in Basho's Series G round. *See* Davenport Tr. 648-53. As with other instances, the contemporaneous documents do not support Davenport's claims.

[252] JX 447; JX 510; Davenport Tr. 507-08.

[253] JX 510.

[254] JX 534.

[255] JX 541; *see* Galleher Tr. 292-93; Fotos 770-71.

[256] JX 542.

[257] *See* JX 549.

agreements and stock option issuances.[258] In December 2014, the Executive Committee acted by written consent to grant approvals required for the loans from Georgetown and Newport and to authorize another $2 million in loans.[259] Then on January 22, 2015, the Board met again and approved a laundry list of actions the Executive Committee had taken during the preceding year. During a meeting on January 26, the Board approved minutes for all of the meetings that had taken place between August 2013 and October 2014. The Board also ratified all of the transactions between Newport and Georgetown.[260] Galleher abstained from each vote, and he voted against ratifying the hiring of Wray.[261]

## K.     A False Hope

In early 2015, Basho showed some signs of success. It achieved the best quarter in its history, closed several million-dollar deals, and its full year bookings for the prior year had increased by 25%.[262] Davenport even thought that IBM might buy Basho.[263]

In February 2015, the Business Development Corporation of America ("BDCA") submitted a term sheet for a $10 million loan plus a $2 million investment in the Series G

---

[258] JX 542; JX 550.

[259] JX 566.

[260] JX 588; Galleher Tr. 295-96; Fotos Tr. 765-70, 791-801.

[261] JX 588 at 10.

[262] JX 570.

[263] *See* JX 569 at REISLEY 000629; Davenport Tr. 706.

round, pending remaining diligence.[264] BDCA had started looking at Basho as part of Basho's fundraising efforts during the previous summer.[265] Georgetown saw this as a big opportunity, and Reisley instructed management to cooperate fully.[266] On March 9, the BDCA investment closed.[267] Basho used a portion of the proceeds to pay off the loans from Newport.[268]

On March 26, 2015, FTV Capital proposed to lead an investment round of $45 million at a pre-money valuation of $130 million.[269] Davenport caused Georgetown to block the investment because he believed it would be highly dilutive to Georgetown's equity position. Davenport instead tried to use the term sheet to generate a deal with IBM.[270]

Unfortunately, Basho experienced another downturn.[271] Investors were growing restless and demanding tangible results.[272] As of June 2015, Basho had approximately $5.3

---

[264] *See* JX 589; JX 591.

[265] JX 520 at REISLEY 053151.

[266] JX 593 at WRAY00008231.

[267] PTO ¶ 81.

[268] JX 623 at REISLEY 040462.

[269] JX 607.

[270] JX 610.

[271] *See* JX 617; JX 630.

[272] JX 621.

million on hand with a burn rate of $1.5 million per month, and BDCA had communicated that it would not refinance its loan.[273] Management tried to adjust Basho's strategy,[274] but the Company's performance continued to decline.[275]

Georgetown continued to look for outside capital, but opportunities were slim, and the terms were only getting worse. In November 2015, JMI Equity proposed to lead a $25 million Series H round, which could be increased to $30 million at the investors' option, but at a pre-money enterprise value of $40 million. Under the term sheet, all of the prior series of preferred stock—Series A through G—would be converted into common stock. JMI also demanded a significant role in Basho's governance.[276] Management supported the deal.[277] It ultimately fell through,[278] forcing Basho to accept another loan from Georgetown.[279]

On December 11, 2015, Galleher resigned from the Board. On December 14, he filed this lawsuit.[280]

---

[273] JX 630 at BTH00003629-30.

[274] *See* Fotos Tr. 773-74.

[275] *See* JX 640 at Davenport 0035587-88.

[276] JX 646; *see* Galleher Tr. 306-07.

[277] JX 648 at WRAY00005446.

[278] *See* JX 658.

[279] *See* JX 657; JX 659.

[280] PTO ¶¶ 78-79.

## L.     Receivership

In February 2016, Davenport and Kenneth Clark, a former business partner of Davenport's, invested $6 million in Basho through KEC Capital, LLC. Each contributed $2.5 million in cash, and Georgetown also converted $1 million of Basho's indebtedness. In return, they received shares of Series H preferred stock.[281]

In September 2016, Basho defaulted on its loan from BDCA.[282] Davenport blamed Wray and the management team.[283] Rather than immediately foreclosing, BDCA tried to work with Basho.[284] BDCA and Basho continued negotiations, and Davenport made a last ditch effort to sell the Company's intellectual property to Amazon.com, Inc.[285] The deal never came to fruition.[286]

By May 2017, Basho had ceased operations as a going concern. In July 2017, BDCA obtained an order from a court in the State of Washington that placed Basho into

---

[281] JX 668; *see* Davenport Tr. 668-71.

[282] PTO ¶ 82.

[283] *See* JX 677; JX 692.

[284] *See* PTO ¶¶ 83-85; JX 707. The pre-trial order contains two paragraphs 84 and two paragraphs 85. This citation references the first set.

[285] *See* JX 728; JX 732; Davenport Tr. 515-16.

[286] Davenport Tr. 711-12.

receivership.[287] As part of the liquidation, the receiver sold any claims that Basho might have against the defendants to the plaintiffs.[288]

## II.    LEGAL ANALYSIS

By the time of post-trial briefing and argument, the plaintiffs had narrowed their claims to the assertion that Georgetown, Davenport, and Fotos breached their fiduciary duties. At one time, questions about the distinction between direct and derivative claims might have loomed large, but as part of Basho's receivership, the plaintiffs purchased all of Basho's derivative claims. All other claims have been dismissed[289] or waived.[290]

The plaintiffs' claim for breach of fiduciary duty covers two time periods. First, the plaintiffs contend that Georgetown and Davenport breached their duties by forcing the Company to accept the onerous Series G Financing. They claim that the closing of the Series G Financing inflicted serious harm on the Company and damaged the value of the plaintiffs' shares.

Second, the plaintiffs contend that after the Series G Financing, Georgetown, Davenport, and Fotos breached their fiduciary duties by managing the Company to serve

---

[287] PTO ¶¶ 84-85. This citation references the second set of these paragraphs.

[288] *See id.* ¶¶ 87-88.

[289] *See* Dkt. 233 (dismissing claims against Robert L. Reisley, Adam J. Wray, and Atsushi Yamanaka).

[290] Count III alleged a claim for tortious interference with prospective contractual relations. The parties did not brief or argue that claim. *See* Dkt. 274 at 6. It is therefore waived. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

Georgetown's interests, rather than the interests of the Company and its stockholders as a whole. During this period, Georgetown and Davenport controlled the Company at both the stockholder and Board levels. After forming a majority of a three-member Executive Committee, Davenport and Reisley ran the Company without input or oversight from any other directors. During this authoritarian reign, Georgetown and its representatives caused the Company to enter into a series of self-dealing transactions and continued to refuse third-party capital that could dilute their control. The plaintiffs contend that after the Company had been weakened by the onerous Series G Financing, the actions of Georgetown and its representatives damaged the Company further, leading to its eventual liquidation.

A claim for breach of fiduciary duty is an equitable tort.[291] The basic elements of a common law tort claim are well known: The plaintiff must prove existence of a duty, a breach of that duty, injury, and a causal connection between the breach and injury that is sufficient to warrant a remedy, such as compensatory damages. Similar concepts frame the analysis of an equitable claim for breach of fiduciary duty, although decisions have tailored these concepts to the equitable setting involving a relationship of trust and confidence between the fiduciary and the *cestui que trust*.[292]

---

[291] *Hampshire Gp., Ltd. v. Kuttner*, 2010 WL 2739995, at *54 (Del. Ch. July 12, 2010) (Strine, V.C.) ("A breach of fiduciary duty is easy to conceive of as an equitable tort."); *see also Restatement (Second) Torts* § 874 cmt. b (Am. Law Inst. 1979) ("A fiduciary who commits a breach of his duty as a fiduciary is guilty of tortious conduct."). *See generally* J. Travis Laster & Michelle D. Morris, *Breaches of Fiduciary Duty and the Delaware Uniform Contribution Act*, 11 Del. L. Rev. 71 (2010).

[292] *Auriga Capital Corp. v. Gatz Props.*, 40 A.3d 839, 850 (Del. Ch. 2012) (Strine, C.) ("Under Delaware law, '[a] fiduciary relationship is a situation where one person

The equitable tort for breach of fiduciary duty has only two formal elements: (i) the existence of a fiduciary duty and (ii) a breach of that duty.[293] The first element closely resembles the corresponding aspect of a common law tort claim: the plaintiff must prove by a preponderance of the evidence that the defendant was a fiduciary and owed duties to the plaintiff. The second element departs from the common law model in significant respects. For the traditional common law tort, the court analyzes the question of breach using the standard of conduct that the defendant was expected to follow.[294] For the equitable tort, the court evaluates the question of breach through the lens of one of several possible standards of review.[295] "In each manifestation, the standard of review is more

reposes special trust in and reliance on the judgment of another or where a special duty exists on the part of one person to protect the interests of another.'" (quoting *Metro Ambulance, Inc. v. E. Med. Billing, Inc.*, 1995 WL 409015, at *2 (Del. Ch. July 5, 1995)), *aff'd*, 59 A.3d 1206 (Del. 2012).

[293] *See Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010); *accord ZRii, LLC v. Wellness Acq. Gp., Inc.*, 2009 WL 2998169, at *11 (Del. Ch. Sept. 21, 2009) (citing *Heller v. Kiernan*, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002)).

[294] *See generally* Melvin Aron Eisenberg, *The Divergence of Standards of Conduct and Standards of Review in Corporate Law*, 62 Fordham L. Rev. 437, 461-67 (1993).

[295] *Chen v. Howard-Anderson*, 87 A.3d 648, 666 (Del. Ch. 2014); *In re Trados Inc. S'holder Litig.* (*Trados II*), 73 A.3d 17, 35-36 (Del. Ch. 2013); *see also* William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Realigning the Standard of Review of Director Due Care with Delaware Public Policy: A Critique of* Van Gorkom *and its Progeny as a Standard of Review Problem*, 96 Nw. U. L. Rev. 449, 451-52 (2002) [hereinafter *Realigning the Standard*]; William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Function Over Form: A Reassessment of the Standards of Review in Delaware Corporation Law*, 56 Bus. Law. 1287, 1295-99 (2001) [hereinafter *Function Over Form*].

forgiving of [defendant fiduciaries] and more onerous for [the] plaintiffs than the standard

of conduct."[296]

If the governing standard of review is the business judgment rule, then the plaintiff

bears the initial burden of proving that the defendant breached her duty of loyalty or her

duty of care, thereby rebutting one of the business judgment rule's presumptions and

triggering further review of the decision under the entire fairness test.[297] It is possible,

however, that the plaintiff will not always bear the burden of proving breach. When the

governing standard of review is entire fairness, either because the plaintiff has made the

necessary showing to rebut the business judgment rule or for other reasons, then the

defendant fiduciaries bear the burden of proof to show that they in fact acted in a manner

---

[296] *Chen*, 87 A.3d at 666; *see also id.* at 667 ("The numerous policy justifications for this divergence largely parallel the well-understood rationales for the business judgment rule."). For cogent explanations, see *Function over Form*, *supra*, at 1296, and *Realigning the Standard*, *supra*, at 451-57; *accord* Eisenberg, *supra*, at 461-67; E. Norman Veasey & Christine T. Di Guglielmo, *What Happened in Delaware Corporate Law and Governance from 1992–2004? A Retrospective on Some Key Developments*, 153 U. Pa. L. Rev. 1399, 1421-28 (2005); Julian Velasco, *The Role of Aspiration in Corporate Fiduciary Duties*, 54 Wm. & Mary L. Rev. 519, 553-58 (2012). Opinions articulating the policy rationales for applying standards of review that are more lenient than the underlying standards of conduct include *Brehm v. Eisner*, 746 A.2d 244, 255-56 (Del. 2000) and *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1052 (Del. Ch. 1996) (Allen, C.).

[297] *See In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 52 (Del. 2006) (explaining that business judgment rule can be rebutted by establishing "the directors breached their fiduciary duty of care or of loyalty or acted in bad faith" and "[i]f that is shown, the burden then shifts to the director defendants to demonstrate that the challenged act or transaction was entirely fair to the corporation and its shareholders"); *accord Brehm*, 746 A.2d at 264 n.66; *Cinerama, Inc. v. Technicolor, Inc. (Technicolor Plenary IV)*, 663 A.2d 1156, 1163 (Del. 1995); *Cede & Co. v. Technicolor, Inc. (Technicolor Plenary II)*, 634 A.2d 345, 363 (Del. 1993).

that was entirely fair to their beneficiaries.[298] By making this showing, the defendant can establish that no breach of duty in fact occurred, even if the defendant committed errors or engaged in improprieties along the way.[299]

Although a claim for breach of fiduciary duty has only two formal elements, a plaintiff will not be awarded a meaningful remedy without additional showings that parallel the other elements of a traditional common law tort claim. One is a showing of harm to the beneficiary or, alternatively, the wrongful taking of a benefit by the fiduciary.[300] Another is showing that a sufficiently convincing causal linkage exists between the breach of duty

---

[298] *Ams. Mining*, 51 A.3d at 1239; *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983).

[299] *See, e.g., Trados II*, 73 A.3d at 78 (finding transaction was entirely fair despite defendants' failure to follow a fair process); *see also In re Dole Food Co., Inc. S'holders Litig.*, 2015 WL 5052214, at \*34 n.26 (Del. Ch. Aug. 27, 2015) (discussing possibility of altruistic controller who effectuates a transaction using an unfair process for purpose of conferring a more-than-fair result). Likewise, when the intermediate standard of enhanced scrutiny governs, the burden of proof similarly shifts to the defendants, but to satisfy their burden they need only show that they acted for a valid corporate purpose and that their actions fell within a range of reasonableness. *See, e.g.*, *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 45-46 (Del. 1994); *Citron v. Fairchild Camera & Instr. Corp.*, 569 A.2d 53, 64-65 (Del. 1989); *Goodwin v. Live Entm't, Inc.*, 1999 WL 64265, at \*22 (Del. Ch. Jan. 25, 1999) (Strine, V.C.); *Yanow v. Sci. Leasing, Inc.*, 1991 WL 165304, at \*9-10 (Del. Ch. July 31, 1991).

[300] *See Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831, 838 (Del. 2011) ("[I]t is inequitable to permit the fiduciary to profit from using confidential corporate information. Even if the corporation did not suffer actual harm, equity requires disgorgement of that profit."); Doug Rendleman, *Measurement of Restitution: Coordinating Restitution with Compensatory Damages and Punitive Damages*, 68 Wash. & Lee L. Rev. 973, 990 (2011) ("Actual harm to the corporation is not . . . a prerequisite for a plaintiff to state a claim for restitution-disgorgement.").

and the remedy sought that makes the remedy an apt means of addressing the breach.[301] A court may award nominal damages if a breach existed but does not warrant a meaningful remedy.[302]

These concepts frame the analysis of the claims in this case. Although a case like this one potentially raises many knotty legal questions, the parties painted in broad strokes. This decision represents my best attempt to appropriately analyze this matter consistent with the parties' presentations and the record they created.

## A. The Series G Financing

The plaintiffs contend that Georgetown and Davenport breached their fiduciary duties in connection with the Series G Financing. The plaintiffs satisfied all the

---

[301] *See In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 773, 775 (Del. 2006) (explaining that when seeking post-closing damages for breach of fiduciary duty based on false or misleading disclosures, plaintiff must prove a causal link between disclosure violation and quantifiable damages); *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, *20 (Del. Ch. July 21, 2017) (finding transaction was entirely fair where controller engaged in acts of unfair dealing, but third party bidder intervened and severed any causal connection between controller's actions and ultimate deal price), *aff'd*, – A.3d –, 2018 WL 1905256 (Del. Apr. 23, 2018); *see also In re Wayport, Inc. Litig.*, 76 A.3d 296, 314-15 (Del. Ch. 2013) ("A failure to disclose material information in [the context of a request for stockholder action] may warrant an injunction . . . but will not provide a basis for damages from defendant directors absent proof of (i) a culpable state of mind or non-exculpated gross negligence, (ii) reliance by the stockholders . . . , and (iii) damages proximately caused by that failure.").

[302] *See, e.g.*, *Ravenswood Inv. Co., L.P. v. Estate of Winmill*, 2018 WL 1410860, at *2, 19, 25 (Del. Ch. Mar. 21, 2018) (awarding nominal damages for breach of duty); *Lake Treasure Hldgs., Ltd. v. Foundry Hill GP LLC*, 2014 WL 5192179, at *1, 9, 13 (Del. Ch. Oct. 10, 2014) (same); *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *51 (Del. Ch. Sept. 4, 2014) (same); *Oliver v. Bos. Univ.*, 2006 WL 1064169, *25, 29, 30, 32, 34-35 (Del. Ch. Apr. 14, 2006) (same).

requirements necessary to receive a meaningful remedy for the injury inflicted by the Series G Financing.

## 1. Fiduciary Status

The first question is whether the plaintiffs proved that Georgetown and Davenport owed fiduciary duties in connection with the Series G Financing. They did.

For Davenport, the answer is easy. He was a director of Basho and owed fiduciaries duties in that capacity.

For Georgetown, the analysis is more difficult. Georgetown was a stockholder, and that status alone does not give rise to fiduciary duties. Instead, stockholders are the beneficiaries of the fiduciary duties owed by the corporation's directors and officers. But identifying Georgetown as a stockholder does not end the analysis, because "Delaware law imposes fiduciary duties on those who effectively control a corporation."[303] If a defendant wields control over a corporation, then the defendant takes on fiduciary duties, even if the defendant is a stockholder who otherwise would not owe duties in that capacity.

One means of establishing that a defendant wields control sufficient to impose fiduciary duties is for the plaintiff to show that the defendant has the ability to exercise a majority of the corporation's voting power.[304] Before the Series G Financing, Georgetown

---

[303] *Quadrant Structured Prods. Co. Ltd. v. Vertin*, 102 A.3d 155, 183-84 (Del. Ch. 2014); *see S. Pac. Co. v. Bogert*, 250 U.S. 483, 487–88 (1919).

[304] *See Kahn v. Lynch Commc'n Sys., Inc. (Lynch I)*, 638 A.2d 1110, 1113 (Del. 1994) (observing that a stockholder becomes a fiduciary if it "'owns a majority interest in . . . the corporation.'") (quoting *Ivanhoe P'rs v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987)); *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del.

did not exercise a majority of Basho's voting power, so it did not control Basho under this standard.

A defendant without majority voting power can be found to owe fiduciary duties if the plaintiff proves that the defendant in fact "*exercises control* over the business and affairs of the corporation."[305] "The requisite degree of control can be shown to exist generally or with regard to the particular transaction that is being challenged."[306]

To show that the requisite degree of control exists generally, a plaintiff may establish that a defendant or group of defendants exercised sufficient influence "that they, as a practical matter, are no differently situated than if they had majority voting control."[307] One means of doing so is to show that the defendant, "as a practical matter, possesses a combination of stock voting power and managerial authority that enables him to control

---

Ch. Aug. 18, 2006) (Strine, V.C.) ("Under our law, a controlling stockholder exists when a stockholder . . . owns more than 50% of the voting power of a corporation . . . ."); *Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006) ("A shareholder is a 'controlling' one if she owns more than 50% of the voting power in a corporation.").

[305] *Lynch I*, 638 A.2d at 1113 (internal quotation marks omitted) (quoting *Ivanhoe*, 535 A.2d at 1344).

[306] *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 659 (Del. Ch. 2013) (internal quotation marks omitted) (quoting *Williamson*, 2006 WL 1586375, at *4); *accord In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 257 (Del. Ch. 2006) ("control over the particular transaction at issue [is] enough"); *see also* American Law Institute, *Principles of Corporate Governance* § 1.10(a)(2) (1994) (defining controlling stockholder as a person who has the power to vote more than 50% of the voting equity or "otherwise exercises a controlling influence over the management or policies of the corporation *or* the transaction or conduct in question" (emphasis added)).

[307] *PNB Hldg.*, 2006 WL 2403999, at *9.

the corporation, if he so wishes."[308] For purposes of their challenge to the Series G

Financing, the plaintiffs do not seek to show that Georgetown exercised control pervasively

over Basho's business and affairs.

As noted above, a plaintiff also may prove that a defendant exercised actual control

over the corporation with respect to a particular transaction or decision. In this way, a

defendant

> that does not, as a general matter, exercise actual control over a corporation's business and affairs or over the corporation's board of directors, but does, in fact, exercise actual control over the board of directors during the course of a particular transaction, can assume fiduciary duties for purposes of that transaction.[309]

For this purpose, a showing of "pervasive control over the corporation's actions is not

required."[310] Rather, the plaintiff must establish that the defendant exercised "actual control

with regard to the particular transaction that is being challenged."[311] "[T]he *potential* ability

to exercise control is not sufficient."[312]

---

[308] *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 553 (Del. Ch. 2003) (Strine, V.C.).

[309] 1 Stephen A. Radin, *The Business Judgment Rule* 1129 (6th ed. 2009) (internal quotation marks omitted) (quoting *In re W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at *20 (Del. Ch. May 22, 2000)).

[310] *Superior Vision Servs., Inc. v. Reliastar Life Ins. Co.*, 2006 WL 2521426, at *4 (Del. Ch. Aug. 25, 2006); *see also Primedia*, 910 A.2d at 257 (noting that transactional control does not require control over day-to-day business operations); *Williamson*, 2006 WL 1586375, at *4 (same).

[311] *Superior Vision*, 2006 WL 2521426, at *4; *accord Carsanaro*, 65 A.3d at 659.

[312] *Williamson*, 2006 WL 1586375, at *4.

It is impossible to identify or foresee all of the possible sources of influence that could contribute to a finding of actual control over a particular decision. Examples include, but are not limited, to: (i) relationships with particular directors that compromise their disinterestedness or independence,[313] (ii) relationships with key managers or advisors who play a critical role in presenting options, providing information, and making recommendations,[314] (iii) the exercise of contractual rights to channel the corporation into a particular outcome by blocking or restricting other paths,[315] and (iv) the existence of

---

[313] *See, e.g.*, *In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *17 (Del. Ch. Mar. 28, 2018) (considering defendant's relationships with directors as factor supporting reasonable inference of control); *Calesa Assocs., L.P. v. Am. Capital, Ltd.*, 2016 WL 770251, at *11 (Del. Ch. Feb. 29, 2016) (finding allegations supported inference defendant was a controlling stockholder where it was reasonably conceivable "to infer that a majority of the Board was not independent or disinterested, but rather was under the influence of, or shared a special interest with," the defendant); *Thermopylae Capital P'rs, L.P. v. Simbol, Inc.*, 2016 WL 368170, at *14 (Del. Ch. Jan. 29, 2016) (recognizing defendant can exercise control over a decision if defendant "had achieved control or influence over a majority of directors through non-contractual means, such as affiliation or aligned self-interest"); *N.J. Carpenters Pension Fund v. infoGROUP, Inc.*, 2011 WL 4825888, at *11 (Del. Ch. Oct. 6, 2011) (drawing inference defendant dominated majority of directors).

[314] *See OTK Assocs., LLC v. Friedman*, 85 A.3d 696, 706-07 (Del. Ch. 2014) (considering defendant's relationship with management, including tips received by defendant from company's officers that provided negotiating leverage, as supporting reasonable inference of control); *see also Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1061 (Del. Ch. 2004) (Strine, V.C.) (discussing interactions between board chairman and banker).

[315] *See Williamson*, 2006 WL 1586375, at *4 (noting that "board veto power *in and of* itself" does not give rise to control but that defendants' "veto power is significant for analysis of the control issue" because it indicated that defendants "had the ability to shut down the effective operation of the At Home board of directors by vetoing board actions"); Joseph W. Bartlett & Kevin R. Garlitz, *Fiduciary Duties in Burnout/Cramdown Financings*, 20 J. Corp. L. 593, 601 (1995) (discussing role of blocking rights as source of

commercial relationships that provide the defendant with leverage over the corporation, such as status as a key customer or supplier.[316] Lending relationships can be particularly potent sources of influence,[317] to the point where courts have recognized a claim for lender

_____

control for venture capital funds over portfolio companies). As with other indicators of control, a blocking right standing alone is highly unlikely to support either a finding or a reasonable inference of control. *See Thermopylae Capital*, 2016 WL 368170, at *13 ("Under Delaware law, however, contractual rights held by a non-majority stockholder do not equate to control, even where the contractual rights allegedly are exercised by the minority stockholder to further its own goals."); *see also id.* at *14 ("[A] stockholder who—via majority stock ownership or through control of the board—operates the decision-making machinery of the corporation, is a classic fiduciary; in controlling the company he controls the property of others—he controls the property of the non-controlling stockholders. Conversely, an individual who owns a contractual right, and who exploits that right—even in a way that forces a reaction by a corporation—is simply exercising his own property rights, not that of others, and is no fiduciary."). C*ompare Superior Vision*, 2006 WL 2521426, at *5 ("In sum, a significant shareholder, who exercises a duly-obtained contractual right that somehow limits or restricts the actions that a corporation otherwise would take, does not become, without more, a 'controlling shareholder' for that particular purpose.") *with id.* ("There may be circumstances where the holding of contractual rights, coupled with a significant equity position and other factors, will support the finding that a particular shareholder is, indeed, a 'controlling shareholder,' especially if those contractual rights are used to induce or to coerce the board of directors to approve (or refrain from approving) certain actions.").

[316] *See Williamson*, 2006 WL 1586375, at *5 (considering defendants' status as corporation's "only significant customers" and noting that corporation "depended on their cooperation as customers if it was going to operate its business profitably").

[317] *See, e.g.,* Joanna M. Shepherd et. al., *What Else Matters for Corporate Governance?: The Case of Bank Monitoring*, 88 B.U. L. Rev. 991, 995 (2008) ("The standard loan agreement imposes numerous operating and financial constraints on the borrower firm. The borrower is also typically required to maintain a regular flow of information to the bank, detailing the borrower's operating performance and current financial condition." (footnote omitted)); *id.* at 1002 ("The detailed reporting obligations and contract constraints imposed by the loan agreement, as well as the bank's ability to control the borrower's cash, enable the bank literally to control the firm."); Douglas G. Baird & Robert K. Rasmussen, *Private Debt and the Missing Lever of Corporate Governance*, 154 U. Pa. L. Rev. 1209, 1243-45 (2006) (explaining role of private debt as

liability when a lender exercises influence over a company that goes "beyond the domain of the usual money lender" and, while doing so, acts negligently or in bad faith.[318]

Broader indicia of effective control also play a role in evaluating whether a defendant exercised actual control over a decision. Examples of broader indicia include ownership of a significant equity stake (albeit less than a majority),[319] the right to designate

---

a "lever of corporate control"); *id.* at 1231-32 (describing features of loan agreements that afford lenders influence and control).

[318] *NVent, LLC v. Hortonworks, Inc.*, 2017 WL 449585, at *9 (Del. Super. Feb. 1, 2017) (internal quotation marks omitted) (quoting *Connor v. Great W. Sav. & Loan Ass'n*, 44 P.2d 609, 616 (Cal. 1968)). *See generally* Daniel R. Fischel, *The Economics of Lender Liability*, 99 Yale L.J. 131 (1989) (analyzing lender liability as remedy for lender misbehavior); Margaret Hambrecht Douglas-Hamilton, *Creditor Liabilities Resulting from Improper Interference with a Management of a Financially Troubled Debtor*, 31 Bus. Law. 343 (1975) (cataloging cases of lender liability).

[319] *See In re Crimson Exploration Inc. S'holders Litig.*, 2014 WL 5449419, at *10-12 (Del. Ch. Oct. 24, 2014) (collecting cases). Section 203 of the Delaware General Corporation Law creates a presumption of control at 20% ownership. *See* 8 *Del. C.* § 203(c)(4) ("A person who is the owner of 20% or more of the outstanding voting stock of any corporation, partnership, unincorporated association or other entity shall be presumed to have control of such entity, in the absence of proof by a preponderance of the evidence to the contrary."). The same section uses the acquisition of 15% ownership as a threshold for a degree of influence warranting restrictions. *See* 8 *Del. C.* § 203(c)(5) (definition of interested stockholder). The American Law Institute recommends a rebuttable presumption of control when a person has the power to vote more than 25% of the voting equity of a corporation. *See* American Law Institute, *Principles of Corporate Governance* § 1.10(b). Many federal statues establish comparable thresholds for control or presumptive control. The Bank Holding Company Act of 1956 sets a 25% threshold for control of a bank. 12 U.S.C. § 1841(a)(2)(A) (noting control exists when "the company directly or indirectly or acting through one or more other persons owns, controls, or has power to vote 25 per centum or more of any class of voting securities of the bank or company."). The statute's implementing regulations establish "rebuttable presumptions of control" at 5% ownership. 12 C.F.R. § 225.31 (d)(2)(ii). For savings and loans, the thresholds are 25% for control and 10% for a rebuttable presumption of control. *See* 12 C.F.R. §§ 574.4(a) & (b)(i)-(ii). For public utilities, "holding company" status arises at 10% ownership. *See* 42 U.S.C. §

directors (albeit less than a majority),[320] decisional rules in governing documents that enhance the power of a minority stockholder or board-level positon,[321] and the ability to exercise outsized influence in the board room, such as through high-status roles like CEO, Chairman, or founder.[322]

Invariably, the facts and circumstances surrounding the particular transaction will loom large. Probative evidence can include statements by participants or other

---

16451(8)(A)(i). The securities laws do not require any level of ownership at all, defining control to mean "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405; *accord* 17 C.F.R. § 240.12b-2 (same). For a comprehensive overview of control statutes and their application, see generally Phillip I. Blumberg, *Control and the Partly Owned Corporation: A Preliminary Inquiry Into Shared Control*, 10 Fla. J. Int'l L. 419 (1996).

[320] *See, e.g.*, *Williamson*, 2006 WL 1586375, at *4 ("The fact that an allegedly controlling shareholder appointed its affiliates to the board of directors is one of many factors Delaware courts have considered in analyzing whether a shareholder is controlling."); *Lynch I*, 638 A2d at 1112, 1114-15 (considering right of Alcatel U.S.A. Corporation to designate five of eleven directors of Lynch Communications Systems, Inc. as part of affirming trial court's finding of actual control).

[321] *See Tesla*, 2018 WL 1560293, at *15 (considering high voting requirements imposed by bylaws for certain actions that gave defendant a strong likelihood of blocking them from taking place).

[322] *See, e.g.*, *id.* at *2, 3, 13, 16, 19 (considering defendant's status as founder, Chairman, CEO, and Chief Product Architect as part of factors supporting reasonable inference of control); *Cysive*, 836 A.2d at 533-35 (considering defendant's status as founder, CEO, and chairman when making finding of control). To state the obvious, no director or officer likes to receive explicit or implicit criticism or face ongoing hostility from another board member, but the explicit or implicit threat of retaliation will carry much more weight if it comes from a (hypothetical) defendant who controls 25% of the voting power of the company, has the right under the certificate of incorporation or through a stockholders agreement to appoint one-third of the directors, and serves as Chairman of the Board with the power to call board meetings and set the agenda. Context matters.

contemporaneous evidence indicating that a defendant was in fact exercising control over a decision. A court also can consider whether the defendant insisted on a particular course of action, whether there were indications of resistance or second thoughts from other fiduciaries, and whether the defendant's efforts to get its way extended beyond ordinary advocacy to encompass aggressive, threatening, disruptive, or punitive behavior.[323]

Rarely (if ever) will any one source of influence or indication of control, standing alone, be sufficient to make the necessary showing.[324] A finding of control after trial, like a reasonable inference of control at the pleading stage, typically results when a confluence of multiple sources combines in a fact-specific manner to produce a particular result.[325]

---

[323] *See, e.g.*, *Lynch I*, 638 A.2d at 1114 (citing bullying by Alcatel directors, including statement to Lynch board that "'You must listen to us. We are 43 percent owner. You have to do what we tell you.'"); *Tesla*, 2018 WL 1560293, at *15 (considering that defendant had "demonstrated a willingness to facilitate the ouster of senior management when displeased"); *infoGROUP, Inc.*, 2011 WL 4825888, at *11 (crediting inference that defendant dominated board through threats and intimidation, including statements that "some directors would be sued," and calls for firing company management).

[324] *Calesa Assocs.*, 2016 WL 770251, at *11 ("[T]here is no magic formula to find control; rather, it is a highly fact specific inquiry."); *see Superior Vision*, 2006 WL 2521426, at *4 (citing need to consider multiple factors); *Williamson*, 2006 WL 1586375, at *4-6 (discussing factors such as the right to designate directors, blocking rights, and commercial relationships; noting that each one individually, without more, would not be sufficient, but finding that factors combined to support inference of control).

[325] *See OTK Assocs.,* 85 A.3d at 702 (finding it reasonably conceivable that "[d]espite not owning a mathematical majority of the Company's common stock, [the defendant] held a combination of securities and contract rights that, together with [the defendant's] board representation and close relationships with management, gave [the defendant] effective control over [the company].").

70

The plaintiffs proved at trial that Georgetown exercised effective control over Basho for purposes of the decision to consummate the Series G Financing. Georgetown exercised effective control as a result of a combination of factors:

- Georgetown's use of its contractual rights to channel the Company into a position where it had no options other than to accept Georgetown's terms.

- Davenport and Reisley's efforts, taken on Georgetown's behalf, to spread misinformation about Georgetown's intentions and the status of negotiations.

- Davenport's interference with Collins and other members of management.

- Davenport's influence over Cowen, which Davenport used to manipulate the fundraising process.

- Georgetown's insistence on the Series G Financing, supported by Davenport and Reisley's threats and combative behavior.

Supporting these transaction-specific considerations are general indicia of control, including Georgetown's status as a significant stockholder and its ability to designate two Board seats. Although this decision discusses the transaction-specific considerations individually, the finding of actual control rests on the totality of the facts and circumstances, considered in the aggregate.

### a. Georgetown's Use Of Its Contractual Rights

During the period leading up to the Series G Financing, Georgetown used its contractual rights to cut off the Company's access to other sources of financing. During the same period, Georgetown failed to comply with its obligations to provide financing under the Loan Agreement, first by delaying when it funded draws, then by threatening to cut off financing altogether. By using its contract rights, Georgetown maneuvered the

71

Company into a position of maximum financial distress where it had no options other than to accept the Series G Financing.

As Davenport recognized after closing the Series F round, Georgetown's status as the holder of a majority of the Series F preferred stock gave it the ability to block the Company from raising capital through equity financings. He observed that the power to exercise the blocking right put Georgetown "in the position of being the sole life line of the Company for money."[326]

For a profitable company that can finance its own business plan out of working capital, or for a company that has access to multiple sources of financing, including debt, the ability to block equity raises might not contribute significantly to a finding of control. Basho, however, was a cash-burning, asset-light company that could not borrow and that required regular rounds of equity financing to build out its business. For a company like Basho, the parties that control its access to cash "sit on the company's lifeline, with the ability to turn it on or off."[327] When cash is like oxygen, self-interested steps to choke off the air supply provide a strong indicator of control.

---

[326] JX 15 at Fotos 0001670; *see also* JX 14 at Fotos 0010206 (Davenport observing that with "the Company depending on us to fund it into 2013 couple[d] with our BOD seats and Committee membership we control Basho"); JX 15 (Davenport: "we control the Company."); JX 43 at Fotos 0005793; JX 64 (Davenport observing after Series F round that "[w]e have negative control of the Company"); JX 72 at REISLEY 009053 (Galleher emailing Davenport after Series F round: "I know you hold negative control of the company at this point. I hope that [you] will not diminish my voice in our continued collaboration.").

[327] Bartlett & Garlitz, *supra*, at 601; *see* Manuel A. Utset, *Reciprocal Fairness, Strategic Behavior & Venture Survival: A Theory of Venture Capital-Financed Firms*,

Davenport understood the power that Georgetown possessed, and he recognized that by limiting the Company's access to other sources of capital, the Company would reach a position where it could not refuse Georgetown's terms. To that end, Davenport used Georgetown's rights on several occasions to block alternative transactions. He vetoed an attractive term sheet that Rippert had obtained from Updata because it threatened Georgetown's control of Basho.[328] Instead, he proposed that Basho and Georgetown enter into the Loan Agreement.[329] That alternative enhanced Georgetown's control by forcing Basho to request monthly draws and giving Georgetown rights as a lender, including priority over the equity for amounts that Georgetown loaned Basho.

---

2002 Wis. L. Rev. 45, 66 (2002) ("A venture capitalist's leverage is further strengthened by contract provisions giving it a monopoly over future financing."). There is extensive literature that discusses the use of staged financing as a control device. *See, e.g.*, Darian M. Ibrahim, *The (Not So) Puzzling Behavior of Angel Investors*, 61 Vand. L. Rev. 1405, 1413 (2008) (summarizing role of staged financing); Paul A. Gompers & Josh Lerner, *The Venture Capital Cycle* 1, 139 (2000) (describing staged financing as "the most potent control mechanism a venture capitalist can employ").

Lest sensitive readers fear that this decision signals heightened risk for venture capital firms who exercise their consent rights over equity financings, I reiterate that a finding of control requires a fact-specific analysis of multiple factors. If Georgetown only had exercised its consent right, that fact alone would not have supported a finding of control. The plaintiffs proved that Georgetown and Davenport did far more.

[328] *See* JX 106 at Davenport 0014401 (Davenport: "This Term Sheet is a nonstarter."); *see also* JX 30 at 1 (Davenport: "I don't want any additional investors until we decide it is in our interests."); Davenport Tr. 520-21.

[329] *See* JX 39 at BTH00012168; Davenport Tr. 394.

During the same period, Davenport sent Rippert an email reminding him that any term sheet had to be "acceptable to [Georgetown]."[330] He characterized this email as "my way of reminding [Rippert] that the ultimate decision as to whether the Company accepts any new investor is [Georgetown's] to make. I do not think he understands how difficult we will be until we get everything we want."[331] Shortly after that, Georgetown blocked an attractive term sheet that Rippert had obtained from Tokyo Electron, recognizing that it would alleviate some of the pressure on Basho to borrow funds under the Loan Agreement.[332] When Davenport heard about the Tokyo Electron term sheet, he exulted to his Georgetown colleagues that Rippert "knows that with our blocking rights we control Basho. Therefore, everything he does is geared toward taking those rights. Nice try but we outflanked him months ago."[333] Davenport only permitted the Tokyo Electron investment after the Company agreed to enter into the Loan Agreement.[334]

Georgetown next blocked an investment from NewSpring because it was "too attractive to the new investors and not sufficiently attractive to us."[335] Davenport had Reisley contact NewSpring on a Friday afternoon to tell them that Georgetown would be

---

[330] JX 33 at Fotos 0011742; Reisley Dep. 18-19.

[331] JX 33 at Fotos 0011742.

[332] *See* JX 43.

[333] *Id.* at Fotos 0002204.

[334] *See* JX 45; JX 50.

[335] JX 136 at REISLEY 015857.

submitting a term sheet of its own that following Monday. Georgetown told NewSpring that in any deal, "we [Georgetown] have to have total positive control."[336] NewSpring walked away.[337]

Most consequentially, Georgetown used its blocking rights to prevent the Company from securing an investment from Southeast. After Collins secured a term sheet from Southeast, Davenport told his team that Georgetown would "play along with them until time runs out."[338] Davenport proceeded to string along both the Company and Southeast, sometimes acting receptive towards a deal, at other times acting hostile. During the process, he reiterated to his team that Georgetown would "wait to resolve (or raise) any of our demands until it is too late for the Company and [Southeast] to do a deal with anyone else and the Company is running out of cash."[339] In late November, Davenport bluntly rejected Southeast's term sheet, stating: "[W]e think that this approach is not productive, therefore we do not have any comments on the draft term sheet."[340] Later, when Noonan tried to work out the final terms of a deal, Davenport told him that Georgetown would not consent to any transaction that subordinated its debt or reduced its liquidation preferences.[341] After

---

[336] JX 143.

[337] JX 145; *see* JX 148 at Davenport 0027943; Fotos Tr. 751.

[338] JX 210 at REISLEY 030288.

[339] JX 273.

[340] JX 233; Davenport Tr. 451-52.

[341] JX 328 at SEV-TN 002895.

realizing that Georgetown would only permit Southeast to tag along as a passive investor, Noonan understandably declined to proceed, and the Southeast deal died.

While Georgetown interfered with the Southeast deal, Georgetown also increased the financial pressure on the Company, first by delaying draws under the Loan Agreement and later threatening to cut funds off altogether. Davenport personally decided to use the draws under the Loan Agreement as a way "to force Management to cooperate with [Georgetown]."[342] Davenport then threatened to stop providing any financing under the Loan Agreement, claiming that Basho had suffered a material adverse change because it was running out of cash.[343] Later that month, rather than funding the Loan Agreement per its contractual terms, Reisley told Company management that they should conserve cash by stretching out vendor payments.[344] Although Davenport had Georgetown's lawyer back him up on his interpretation of the Loan Agreement, I do not believe that the interpretation was advanced in good faith. It was advanced to squeeze the Company.[345]

By exercising its contract rights in this fashion, Georgetown forced the Company into a financial crisis. By the time Southeast withdrew, the Company had no other alternatives. Galleher asked Davenport to make a fair proposal. Instead, Georgetown resubmitted its proposal for the Series G Financing and demanded an answer in less than

---

[342] JX 83; Davenport Tr. 545-46.

[343] JX 160.

[344] JX 176.

[345] *Compare* JX 82 *with* JX 83.

76

20 hours. With Georgetown and Davenport having cut off all exits, the Board was forced to accept it.[346]

### b. Davenport and Reisley's Spreading of Misinformation

During the period leading up to the Series G Financing, Davenport and Reisley acted on Georgetown's behalf by spreading misinformation, making threats, and engaging in combative behavior. Beginning in May 2013, Davenport instructed Cowen to begin contacting investors about a Series G round. He instructed Cowen to obtain Georgetown's approval for "all matters related to the Private Placement prior to any discussion with Management,"[347] while at the same time Davenport, Reisley, and Cowen would give Collins (the CEO) and Galleher (the Chairman) the impression that Collins and Cowen were leading the process without Georgetown's involvement.[348] Between themselves, Davenport and Reisley discussed using the capital raise to "get control of the [Board]" so they could get rid of Collins and Galleher.[349]

Davenport and Reisley continued their program of misinformation after Southeast appeared on the scene. They started out by giving Southeast the run-around. Davenport told Miller during a call that Southeast should wait until Georgetown had submitted a term

---

[346] PTO ¶ 40; JX 352; JX 361; JX 384; *see* Galleher Tr. 267-71; Thornley Dep. 126.

[347] JX 80; Davenport Tr. 577-78.

[348] JX 86.

[349] *Id.*

sheet for an investment.[350] He also told Miller that Reisley was handling the transaction and that Miller should talk to him.[351] But when Miller scheduled a call with Reisley, Reisley skipped the call with no notice or excuse.[352] After that initial non-interaction, Reisley continued being belligerent and unprofessional in his dealings with Southeast. Miller later described Reisley as 'obstinate, and non-responsive" and told Collins that Southeast would "never speak with [Reisley] again."[353]

In November 2013, after Georgetown submitted an onerous term sheet for the Series G Financing, Southeast submitted a clearly superior term sheet of its own. Davenport alternated between acting receptive and hostile. Davenport described himself as "play[ing] along . . . until time runs out." [354] Consistent with this plan, Davenport and Reisley communicated a series of conflicting and confusing positions, sometimes expressing support for a Southeast deal and other times being hostile or adopting a passive-aggressive stance. At one point, Davenport told Miller that he could not talk to Company management.[355] When Miller later submitted a term sheet that Davenport had seemed likely

---

[350] *See* JX 141.

[351] JX 144.

[352] JX 147; *see also* Collins Tr. 25-26; 1 Miller Dep. 20.

[353] JX 237 at EPG-0006759; *see also* 2 Miller Dep. 20-21.

[354] JX 210 at REISLEY 030288.

[355] JX 184 at BASH017910.

to accept, Davenport rejected it out of hand without providing any comments.[356] In December and January 2013, the principal investors in Southeast, Seydel and Noonan, tried to work directly with Davenport to strike a deal. Davenport turned down multiple invitations to meet with them.[357] After Davenport finally did speak with Noonan, he told Galleher (falsely) that he and Noonan had not discussed investment terms.[358]

By spreading misinformation and engaging in combative behavior, Davenport and Reisley helped Georgetown channel the Company into a positon where it had no alternatives other than to accept the Series G Financing. Collins and the other members of management, Galleher and the other directors, and Southeast could not make progress towards a transaction in the face of Davenport and Reisley's actions.

### c.     Interference With Management

Georgetown also exerted control over management through Davenport's presence on the Board and interactions with management. If a member of management did not support Georgetown's interests, then Davenport would subvert them, threaten them, or get rid of them. After the Company entered into the Loan Agreement and Georgetown became its primary source of operating capital, Davenport used the monthly draw process as an additional means of controlling management.

---

[356] JX 233; *see also* 1 Miller Dep. 69-70.

[357] Davenport Tr. 623.

[358] JX 332 at BTH00016088-89; *see also* Davenport Tr. 633-35.

The fates of two Basho CEOs illustrate how Georgetown treated management. Davenport originally invested in Basho after speaking with Rippert, and he later supported Galleher's decision to hand over the CEO reins to Rippert.[359] But after Rippert began trying to raise alternative sources of capital that would reduce Georgetown's influence, Davenport decided that Rippert needed to go. Davenport told Galleher that Rippert did not understand "how his 30 year career and net worth will be put in grave jeopardy."[360] At the time, Galleher supported Davenport, and they brought on Collins as a consultant. As Galleher and Davenport had anticipated, Rippert viewed this move as a "constructive termination" and resigned.[361]

Collins' time at Basho followed a similar arc. Originally, Davenport supported his candidacy, expecting him to use his M&A experience to achieve a quick sale. But once Collins proved to have opinions of his own, Davenport began threatening to fire him, sue him, or both.[362] Davenport also made negative comments about Collins in meetings with investors.[363] The situation grew so dire that Collins resigned in the middle of the negotiations with Southeast, stating:

---

[359] JX 6; Galleher Tr. 154; Davenport Tr. 384-85.

[360] JX 42 at EPG-0007347.

[361] *Id.* at EPG-0007346.

[362] JX 182; JX 421 at BTH00046221; Collins Tr. 16-17, 44-45; *see also* JX 224 at BTH00028237.

[363] *See* JX 226 at COWENBASHO00022216.

80

I can't do my job (and won't try) with the continuation of the threats of legal liability or job retention or intimidation to act in one way or the other. My actions, and [Basho's] actions, are fully in compliance with good governance and excellent communication. The threats aren't productive, and constitute duress and reason for my departure for good reason. I don't mean to be so blunt – but that's the case.[364]

Galleher and Thornley convinced Collins to reconsider at the time. Collins ultimately resigned when the Southeast deal fell through.

Once Georgetown became Basho's primary source of financing under the Loan Agreement, Davenport used access to cash to bring management to heel. Davenport told Reisley, "I intend to use [the loan funding] to force Management to cooperate with us on the EB5 documentation and other matters we need them to do. Any questions let me know."[365] Davenport then instructed Linardos, the Company's CFO, to provide Reisley with a monthly budget and financial statements before Davenport would release any funding under the Loan Agreement.[366] Georgetown did not have the right under the Loan Agreement to micromanage the Company's finances in this fashion.[367] Georgetown and Davenport engaged in these practices to dominate management.

---

[364] JX 224 at BTH00028237.

[365] JX 83.

[366] Linardos Dep. 21-25; Thornley Dep. 41-42.

[367] *Cf.* Reisley Dep. 114-16, 120-21.

#### d. Influence Over Cowen

Georgetown also used its relationship with Cowen to control the Company. As a threshold matter, Davenport strong-armed Basho into hiring Cowen.[368] Davenport then shut management out of the sale process, instructing Cowen that Georgetown "need[ed] to drive this process" and that involving management, except when absolutely necessary, "will not result in getting the best price for Basho."[369] Reisley later instructed Cowen only to interface with Georgetown and not with Basho's management.[370] When Collins and Galleher found out and objected, Davenport temporarily cut off communication with them:

> I want these guys to understand that they do not have free access to me. Decisions will be made that they don't like and I will take full responsibility for making those decisions . . . . I want these guys to understand that we are in a full pivot and if they do not produce what we need to exit we will be ruthless.[371]

---

[368] Collins Tr. 10.

[369] JX 60 at REISLEY 010348; *see* JX 61 at REISLEY 009617 (Davenport: "We need to take over.").

[370] *see, e.g.*, JX 59 (Davenport to Cowen: "I do not want Greg [Collins] or anyone from Basho on the call. I want it restricted to the GTP guys."); JX 60 at REISLEY 010347 (Reisley: "I told Matt that Cowen needs to interface with [Georgetown], not management . . .").

[371] JX 76 at REISLEY 009014. Davenport also instructed the other Georgetown members to stop responding to Collins and Galleher. *See* JX 74 (Davenport to Reisley: "Please do not respond [to Galleher] or talk to him or Greg [Collins]. Radio silent[.]"); JX 75 at REISLEY 009046 (Davenport to Reisley: "I think it is best that you go radio silent on Greg [Collins]. He is a mental case. We do not have time to deal with first graders with security issues. I would like to exit and I have no intention to have Greg or Earl involved with our strategy feeding upon each other['] mental problems."); JX 77 at REISLEY 030505 (Davenport telling Reisley that Collins and Galleher's reactions to being cut out of process were "irrational").

When Georgetown and Cowen re-focused on raising capital, Davenport decided decide it was better to mislead Collins and Galleher into thinking they were part of the sales process, while Georgetown worked with Cowen behind their backs.[372] Davenport planned to

> work with Cowen to find an investor who will take Earl [Galleher] off of the payroll. Next we will find an investor that will work with us to get control of the BOD. Together with the new investor we will fire Greg [Collins] and find a real growth focus CEO. **Cowen will work with us to help accomplish our goal**[.] They know that Earl and Greg are hostile to them which is good for us. We will welcome Earl and Greg to the realities of Wall Street. Let the fun begin[.][373]

After Collins perceived what Davenport was doing, he tried to assert his authority as CEO by instructing Cowen to inform him immediately about all communications with Board members and investors.[374] The competing instructions from Davenport and Collins put Cowen in a bind.[375] Cowen's solution was to communicate separately with Georgetown and Basho management so that Cowen could appear to be doing what each of them wanted.[376]

---

[372] *See* JX 75; *see also* Davenport Tr. 569-72.

[373] JX 86 at REISLEY 008987 (emphasis added); *accord* JX 87 REISLEY 008989 (Davenport to Reisley: "Greg [Collins] is a mediocre small minded failure. We need to take control of this Company and Greg and Earl [Galleher] will be history.").

[374] JX 91 at COWENBASHO00020094.

[375] JX 92; *see also* Subudhayangkul Dep. 21.

[376] *See* JX 94; JX 96; *see also* Subudhayangkul Dep. 25-28.

83

This decision need not and does not consider whether Cowen engaged in any culpable conduct. For present purposes, Georgetown's interactions with Cowen provide additional evidence of how Georgetown supplanted the Company's management team during the lead-up to the Series G Financing.

### e. Insistence On The Series G Financing

Finally, Georgetown insisted on the Series G Financing, refused to negotiate or answer questions, and threatened Basho's directors and officers with dire consequences if they did not accept it. In November 2013, Georgetown proposed the onerous terms of the Series G Financing and demanded an answer within 72 hours.[377] Collins asked for more time, but Georgetown refused.[378] When a committee of the Board initially rejected Georgetown's Series G term sheet as too onerous, Davenport threatened to stop funding the Loan Agreement by claiming that Basho had suffered a material adverse change.[379] He also told Collins that Georgetown's deal would only get worse if the Company did not accept it.[380] These threats caused the Board to change its position and authorize the negotiation of definitive documents for a transaction with Georgetown.[381]

---

[377] PTO ¶ 33; JX 831 at BASH006490; Collins Tr. 26.

[378] *See* JX 154 at COWENBASHO00014992; Collins Tr. 26.

[379] JX 160-61; *see* JX 167; Collins Tr. 34-35; Galleher Tr. 222-24; Davenport Tr. 437-38; Linardos Dep. 53-56; Thornley Dep. 69-6.

[380] JX 166.

[381] PTO ¶ 36; Collins Tr. 41-42.

Rather than simply going along, Collins continued pursuing an investment from Southeast. When the Company secured a superior term sheet from Southeast, Davenport told Collins that Basho needed to sign Georgetown's deal within five days or he would sue Collins personally.[382] Davenport also threatened to sue Galleher personally.[383] Later than month, Davenport told Thornley that Basho "will be insolvent" and "this could end badly" unless Basho accepted Georgetown's terms.[384] During a call, he "[y]elled at [Thornley] for two minutes and would not let him say anything."[385] He also told Thornley that he was "upset with him and do not feel he can be trusted."[386] After this call, Thornley supported Georgetown.

In January 2014, Galleher asked Georgetown to make a fair proposal.[387] Davenport refused to budge from the Series G term sheet. Within two weeks, Collins had resigned, and Galleher feared that the Company could not make its next payroll.[388] At this point, Reisley sent a revised Series G proposal that gave Georgetown full control of the Company

---

[382] *See* JX 182; JX 421 at BTH00046221; Collins Tr. 44-45; *see also* JX 224 at BTH00028237.

[383] *See* JX 198 at COWENBASHO00016031; *see* JX 186; 421; Galleher Tr. 222, 292.

[384] JX 184.

[385] JX 216; *see also* Davenport Dep. 185-87.

[386] JX 216.

[387] *See* JX 358-59; Galleher Tr. 267-68.

[388] *See* PTO ¶ 39; JX 346 at REISLEY 035070; Collins Tr. 71; Galleher Tr. 264.

at the stockholder and Board-levels in return for only $2.5 million in new money. He demanded an answer by January 18, 2014 at 6:00 pm—19 hours and 20 minutes later.[389] Galleher replied with a list of questions that he believed Georgetown should answer.[390] Georgetown ignored the questions and insisted that the Company take its deal. With no other options or alternatives, the Company accepted it. Thornley voted in favor because he felt that the Company had no other options.[391] Galleher voted in favor, but only after expressing a lengthy list of objections.[392] Within three months, six senior officers and directors had resigned from the Board, including Collins, Brewer, and Thornley.[393]

### f.    Georgetown's Fiduciary Status

Taken as a whole, the plaintiffs proved by a preponderance of the evidence that Georgetown exercised actual control over the Company in connection with the Series G Financing. Georgetown's actual control did not arise from any single factor, but rather from a confluence of multiple sources of influence. These factors included its contractual rights, which enabled Georgetown to block other financing alternatives, limit the Company's access to capital, and force it into a position of maximum financial distress. They also included the coordinated actions of its representatives, Davenport and Reisley, who spread

---

[389] JX 343; Galleher Tr. 266; Davenport Tr. 647.

[390] JX 350 at COWENBASHO00026703.

[391] *See* Galleher Tr. 267-71; Thornley Dep. 126.

[392] JX 352.

[393] *See* Galleher Tr. 263-65.

86

misinformation, made threats, and engaged in combative behavior. Georgetown also used Cowen to serve its goals. By creating a situation in which the Company had no other alternatives and no more money, Georgetown forced the Company to accept its deal. Because Georgetown exercised actual control over the Company for purposes of the Series G Financing, Georgetown became a fiduciary for purposes of evaluating that transaction.

### 2. Breach

The next question is whether Georgetown and Davenport breached their fiduciary duties in connection with the Series G Financing. To determine whether a corporate fiduciary has breached its duties, a court examines the fiduciary's conduct through the lens of a standard of review.[394] "When a transaction involving self-dealing by a controlling shareholder is challenged, the applicable standard of judicial review is entire fairness, with the defendants having the burden of persuasion."[395]

Once entire fairness applies, the defendants must establish "to the court's satisfaction that the transaction was the product of both fair dealing and fair price."[396] "Not even an honest belief that the transaction was entirely fair will be sufficient to establish

---

[394] *Chen*, 87 A.3d at 666; *Trados II*, 73 A.3d at 35-36; *Realigning the Standard*, *supra*, at 451-52; *Function Over Form*, *supra*, at 1295-99.

[395] *Ams. Mining*, 51 A.3d at 1239; *accord Kahn v. M & F Worldwide Corp.* (*MFW II*), 88 A.3d 635, 642 (Del. 2014); *Kahn v. Tremont Corp.* (*Tremont II*), 694 A.2d 422, 428 (Del. 1997); *Weinberger*, 457 A.2d at 710.

[396] *Technicolor Plenary IV*, 663 A.2d at 1163 (internal quotation marks omitted) (quoting *Technicolor Plenary II*, 634 A.2d at 631).

entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs."[397]

Although entire fairness is Delaware's most onerous standard of review, "[a] determination that a transaction must be subjected to an entire fairness analysis is not an implication of liability."[398] While the reverberations of isolated plaintiffs' victories continue to echo in the collective consciousness, scholarly research establishes that only exceptional entire fairness cases result in meaningful damages awards.[399]

---

[397] *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006).

[398] *Emerald P'rs v Berlin*, 787 A.2d 85, 93 (Del. 2001).

[399] *See, e.g.,* Reza Dibadj, *Networks of Fairness Review in Corporate Law*, 45 San Diego L. Rev. 1, 22 (2008) (observing "[w]hile the conventional wisdom might suggest that standards of review are typically outcome determinative, the empirical research suggests the fairness standard is not . . ." and cataloging cases where defendants prevailed (footnote omitted)); Julian Velasco, *A Defense of the Corporate Law Duty of Care*, 40 J. Corp. L. 647, 689 (2015) (collecting cases where defendants prevailed under entire fairness and noting that "[o]nce applied, the entire fairness test is no longer considered outcome-determinative"). For illustrative cases where the defendants prevailed under the entire fairness standard of review in a post-trial setting, see *Kahn v. Lynch Commc'n Sys., Inc.*, 669 A.2d 79 (Del. 1995); *Technicolor Plenary IV*, 663 A.2d 1156; *Nixon v. Blackwell*, 626 A.2d 1366 (Del. 1993); *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929 (Del. 1985); *Trados II*, 73 A.3d 17; *Zimmerman v. Crothall*, 62 A.3d 676 (Del. Ch. 2013); *S. Muoio & Co. LLC v. Hallmark Entm't Invs. Co.*, 2011 WL 863007 (Del. Ch.), *aff'd*, 35 A.3d 419 (Del. 2011); *In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2011 WL 227634 (Del. Ch. Jan. 14, 2011); *Hanover Direct, Inc. S'holders Litig.*, 2010 WL 3959399 (Del. Ch. Sept. 24, 2010); *Kates v. Beard Research, Inc.*, 2010 WL 1644176 (Del. Ch. Apr. 23, 2010); *Cysive*, 836 A.2d 531; *Emerald P'rs v. Berlin*, 2003 WL 21003437 (Del. Ch.), *aff'd*, 840 A.2d 641 (Del. 2003); *Liberis v. Europa Cruises Corp.*, 1996 WL 73567 (Del. Ch. Feb. 8, 1996), *aff'd*, 702 A.2d 926 (Del. 1997); *Van de Walle v. Unimation, Inc.*, 1991 WL 29303 (Del. Ch. Mar. 7, 1991); *Citron v. E.I. Du Pont de Nemours & Co.*, 584 A.2d 490 (Del. Ch. 1990); *Rabkin v. Olin Corp.*, 1990 WL 47648 (Del. Ch.), *aff'd*, 586 A.2d 1202 (Del. 1990) (TABLE); *Shamrock Hldgs., Inc. v. Polaroid Corp.*, 559 A.2d 257 (Del. Ch. 1989); *see also Kleinhandler v. Borgia*, 1989 WL 76299 (Del. Ch. July 7, 1989) (summary judgment).

"The concept of fairness has two basic aspects: fair dealing and fair price."[400] Although the two aspects may be examined separately, they are not separate elements of a two-part test. "[T]he test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness."[401]

The fair dealing aspect of the unitary entire fairness test "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[402] The various dimensions of fair dealing can interact and elide such that a particular instance of unfair dealing affects multiple phases of the process. This is often the case when a controller engages in an act of unfair dealing that it subsequently fails to disclose. In those situations, the act both provides evidence of unfairness in its own right and gives rise to an additional instance of unfairness in the form of a disclosure violation.[403]

---

As noted previously, in other cases the court has held after trial that the challenged transaction was not entirely fair, but that the plaintiffs had not suffered an injury that warranted an award other than nominal damages. *See, e.g.*, *Nine Sys.*, 2014 WL 4383127; *Oliver*, 2006 WL 1064169.

[400] *Weinberger*, 457 A.2d at 711.

[401] *Id.*

[402] *Id.*

[403] *See Rabkin v. Phillip A. Hunt Chem. Corp.*, 498 A.2d 1099, 1104 (Del. 1985) ("[The] duty of fairness certainly incorporates the principle that a cash-out merger must be free of fraud or misrepresentation."); *Weinberger*, 457 A.2d at 710 (holding entire fairness standard requires compliance with duty of disclosure and incorporating this principle into fair dealing aspect of the test); *Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 281 (Del.

The fair price aspect of the entire fairness test "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock."[404] The fair price aspect calls for the same basic economic inquiry as the fair value standard under the appraisal statute.[405] The two standards differ, however,

1977) (holding that when controlling stockholder pursues squeeze-out merger, controller owes same fiduciary duty of disclosure as directors of controlled corporation).

[404] *Weinberger*, 457 A.2d at 711.

[405] *Id.* at 713 (equating fair price aspect of entire fairness with fair value standard in appraisal); *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 114 (Del. 1952) (adopting valuation standard for appraisal announced in *Tri-Continental v. Battye*, 74 A.2d 71 (Del. 1950), for entire fairness case); *accord Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 845 (Del. 1987) (explaining that fair price aspect of entire fairness standard "flow[s] from the statutory provisions . . . designed to ensure fair value by an appraisal, 8 *Del C.* § 262"); *Rosenblatt*, 493 A.2d at 940 (following *Sterling*); *see, e.g.*, *Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 342-44 (Del. Ch. 2006) (Strine, V.C.) (determining company's per-share value, then using that value "as the basis for a conclusion that the merger was not financially fair to the squeezed-out minority . . . as a matter of equity," and granting same amount as damages); *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *24 (Del. Ch. June 4, 2004) (determining that "fair value" of company was $38.05, stating that "[f]rom that fair value finding it further follows that the $10.25 per share merger price was not a 'fair price' within the meaning of the Delaware fiduciary duty case law beginning with *Weinberger*," and granting difference as damages); *see also* John C. Coates IV, *"Fair Value" As an Avoidable Rule of Corporate Law: Minority Discounts in Conflict Transactions*, 147 U. Pa. L. Rev. 1251, 1261 (1999) ("In entire fairness cases, corporate fiduciaries are required to show that the terms of a proposed conflict transaction include a 'fair price,' and Delaware courts look to appraisal cases for guidance in deciding whether a given price is fair, even when a merger does not trigger appraisal rights."); Lawrence A. Hamermesh & Michael L. Wachter, *Rationalizing Appraisal Standards in Compulsory Buyouts*, 50 B.C. L. Rev. 1021, 1030 (2009) ("[I]t is generally accepted in the Delaware case law and the major treatises on Delaware corporate law that in evaluating the entire fairness of a squeeze-out merger, the courts generally utilize the same valuation analysis for both the fair price prong of the fiduciary duty action and the appraisal action.") (internal quotation marks and footnote omitted); Guhan Subramanian, *Fixing Freezeouts*,

in that the appraisal statute requires that the court determine a point estimate for fair value measured in dollars and cents.[406] The fair price aspect of the entire fairness test, by contrast, is not in itself a remedial calculation. The entire fairness test is a standard of review that is applied to identify a fiduciary breach.[407] "For purposes of determining fairness, as opposed to crafting a remedy, the court's task is not to pick a single number, but to determine whether the transaction price falls within a range of fairness."[408]

Consistent with the unitary nature of the entire fairness test, the fair process and fair price aspects interact. The range of fairness has most salience when the controller has established a process that simulates arm's-length bargaining, supported by appropriate procedural protections.[409] A strong record of fair dealing can influence the fair price inquiry

---

115 Yale L.J. 2, 43 (2005) ("As a starting point, courts in entire fairness proceedings generally look to the appraisal remedy . . . ."). *See generally Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 461-64 (Del. Ch. 2011) (discussing authorities).

[406] 8 *Del. C.* § 262(h); *see In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 30 (Del. Ch. 2014).

[407] *See generally In re Appraisal of Dell Inc.*, 2016 WL 3186538, at *25-27 (Del. Ch. May 31, 2016), *aff'd in part, rev'd in part on other grounds*, *Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd*, 177 A.3d 1 (Del. 2017) (distinguishing between task of determining fair value in appraisal and application of standard of review for purposes of evaluating fiduciary breach, albeit with primary emphasis on intermediate standard of enhanced scrutiny rather than entire fairness). *See generally* Charles Korsmo & Minor Myers, *Reforming Modern Appraisal Litigation*, 41 Del. J. Corp. L. 279, 320-25 (2017) (comparing appraisal with fiduciary review with primary focus on deals without controlling stockholder); Charles R. Korsmo & Minor Myers, *Appraisal Arbitrage and the Future of Public Company M&A*, 92 Wash. U. L. Rev. 1551, 1607-09 (2015) (same).

[408] *Dole*, 2015 WL 5052214, at *33.

[409] *See, e.g., M.P.M. Enters., Inc. v. Gilbert*, 731 A.2d 790, 797 (Del. 1999) ("A merger price resulting from arms-length negotiations where there are no claims of collusion

and lead to a conclusion that the price was fair. But the range of fairness is not a safe-harbor that permits controllers to extract barely fair transactions. Factors such as coercion, the misuse of confidential information, secret conflicts, or fraud could lead a court to hold that a transaction that fell within the range of fairness was nevertheless unfair compared to what faithful fiduciaries could have achieved. Under those circumstances, the appropriate

---

is a very strong indication of fair value."); *Rosenblatt*, 493 A.2d at 937–38 (observing that controller established separate negotiating terms to recreate arm's-length bargaining, that negotiations were adversarial, and that result was "more than the theoretical concept of what an independent board might do under like circumstances" and "clear that these contending parties to the merger in fact exerted their bargaining power against one another"); *Van de Walle*, 1991 WL 29303, at *17 ("The most persuasive evidence of the fairness of the $21 per share merger price is that it was the result of arm's-length negotiations between two independent parties, where the seller . . . was motivated to seek the highest available price, and a diligent and extensive canvass of the market had confirmed that no better price was available. The fact that a transaction price was forged in the crucible of objective market reality (as distinguished from the unavoidably subjective thought process of a valuation expert) is viewed as strong evidence that the price is fair.").

remedy can be a "fairer" price[410] or an award of rescissory damages.[411] Just as a fair process

can support the price, an unfair process can taint the price.[412]

### a. Process

Georgetown and Davenport did not prove that the Series G Financing process was

entirely fair. Instead, the record establishes that the process was decidedly unfair.

---

[410] *Reis*, 28 A.3d at 467; s*ee, e.g.*, *Dole*, 2015 WL 5052214, at *2 (finding that controller and his associate had engaged in fraud; holding that "under these circumstances, assuming for the sake of argument that the $13.50 price still fell within a range of fairness, the stockholders are not limited to a fair price. They are entitled to a fairer price designed to eliminate the ability of the defendants to profit from their breaches of the duty of loyalty."); *HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 116-17 (Del. Ch. 1999) (Strine, V.C.) (finding that although price fell within lower range of fairness, "[t]he defendants have failed to persuade me that HMG would not have gotten a materially higher value for Wallingford and the Grossman's Portfolio had Gray and Fieber come clean about Gray's interest. That is, they have not convinced me that their misconduct did not taint the price to HMG's disadvantage."); *Bomarko, Inc. v. Int'l Telecharge Inc.* (*Bomarko I*), 794 A.2d 1161, 1184-85 (Del. Ch. 1999) (holding that although "uncertainty [about] whether or not ITI could secure financing and restructure" lowered the value of the plaintiffs' shares, the plaintiffs were entitled to a damages award that reflected the possibility that the company might have succeeded absent the fiduciary's disloyal acts), *aff'd*, 766 A.2d 437 (Del. 2000).

[411] *See, e.g.*, *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1023-24 (Del. 2001); *Lynch v. Vickers Energy Corp.* (*Vickers II*), 429 A.2d 497, 501-03 (Del. 1981), *overruled in part on other grounds*, *Weinberger*, 457 A.2d at 703-04; *Paradee v. Paradee*, 2010 WL 3959604, at *13-14 (Del. Ch. Oct. 5, 2010).

[412] *See Tremont II*, 694 A.2d at 432 ("[H]ere, the process is so intertwined with price that under *Weinberger*'s unitary standard a finding that the price negotiated by the Special Committee might have been fair does not save the result."); *Bomarko I*, 794 A.2d at 1183 ("[T]he unfairness of the process also infects the fairness of the price.").

"Fair dealing encompasses an evaluation of how the transaction was initiated."[413] "The scope of this factor is not limited to the controller's formal act of making the proposal; it encompasses actions taken by the controller in the period leading up to the formal proposal."[414]

The Series G Financing was not initiated fairly. In the month before making its proposal, Georgetown interfered with competing investments from NewSpring and Southeast. Georgetown viewed NewSpring's term sheet as "too attractive to the new investors and not sufficiently attractive to us."[415] Georgetown told NewSpring's management on a Friday evening that Georgetown would move forward with its own term sheet that following Monday.[416] NewSpring walked away.[417]

Georgetown tried to use the same strategy with Southeast. After Miller suggested that Southeast would submit a term sheet with a $100 million pre-money valuation, Davenport told Miller that "[Georgetown] was about to submit their own term sheet to the company and that [Miller] and his group could look at that and see if they want to participate."[418] When Miller reiterated that Southeast could submit its own term sheet,

---

[413] *Trados II*, 73 A.3d at 56.

[414] *Dole*, 2015 WL 5052214, at *26.

[415] JX 136 at REISLEY 015857; *see also* JX 143; *see* Fotos Tr. 751, 786.

[416] *See* JX 143; JX 145.

[417] *See* JX 148 at Davenport 0027943; Fotos Tr. 751.

[418] JX 141.

94

Davenport rebuffed him again.[419] Davenport then told Miller to speak with Reisley about Georgetown's term sheet, but Reisley skipped the call with Miller and provided no warning or explanation.[420] Georgetown submitted its term sheet that same day.[421] Rather than working with prospective investors to raise funds for Basho, Georgetown and Davenport tried to drive off perceived competition to advance their own interests.

"Fair dealing encompasses questions of how the transaction was negotiated and structured."[422] Georgetown refused to negotiate or even answer questions about its term sheet. It dictated the terms.

"Fair dealing encompasses questions of how director approval was obtained."[423] This decision has already found that Georgetown used its control over Basho to impose the Series G Financing on the Company. The directors approved the deal, but only because Georgetown and Davenport created a scenario in which the Company had no other options. The same was true for the approvals by stockholders: Georgetown conditioned its proposal on proxies from Galleher and IDCF, which it then voted in favor of the deal it had forced them to accept.

---

[419] *Id.*

[420] JX 147 at BASH017581; *see also* Collins Tr. 25-26; 1 Miller Dep. 20; Reisley Dep. 178-79.

[421] JX 146.

[422] *Trados II*, 73 A.3d at 58.

[423] *Id.* at 62.

None of the traditional indicia of fairness were present in this case. The fair process aspect of the entire fairness test weighs heavily against a finding of fairness.

### b. Price

The fair price aspect can be "the predominant consideration in the unitary entire fairness inquiry."[424] The defendants did not make a meaningful effort at trial to prove that the terms of the Series G Financing were fair. Strikingly, they did not present *any* expert testimony on the subject. Nor did they marshal any meaningful contemporaneous evidence to support financial or economic fairness. To the contrary, a disinterested observer—Miller of Southeast—contemporaneously described an iteration of the Series G Financing as "punitive."[425] Miller believed that by offering "modestly" better terms, Southeast was able to submit what an experienced member of Miller's team regarded as "the best deal he has seen in his career."[426]

Rather than presenting direct evidence of fairness, the defendants argue that the Series G Financing must have been priced fairly because no other party submitted an actionable investment proposal. This argument builds on the recognized proposition that a court's evaluation of whether the substantive aspects of a transaction are fair can be

---

[424] *Dole*, 2015 WL 5052214, at *34.

[425] JX 206 at 1; *see also* 1 Miller Dep. 39-40, 88.

[426] JX 206 at 1; *see also* 2 Miller Dep. 20.

influenced significantly by evidence of true, arms'-length bargaining.[427] The defendants ask the court to agree that the Series G Financing was better than nothing.

This is a case where "the unfairness of the process also infects the fairness of the price."[428] In other settings, the absence of a better offer often provides meaningful evidence of fairness by indicating that the challenged transaction provided a market-clearing price. Here, the defendants drove away the investors who were most interested in the Company.[429] They dissuaded other investors from participating by providing negative feedback about Company management and the Company's prospects.[430] Although Cowen appears to have engaged in a workmanlike effort, the defendants undermined the reliability of that process as an indication of fairness. The absence of competing offers says more about Georgetown's actual control over the Company and the defendants' acts of unfair dealing than it does the fairness of the Series G Financing's price.

In their only other meaningful argument, the defendants cite the implied pre-money valuation in the Series G Financing and contend that its terms must have been fair because other indications of interest contemplated valuations in the same ballpark. In private,

---

[427] *Ams. Mining*, 51 A.3d at 1243-44 (explaining that fairness analysis "will be significantly influenced by the work product of a properly functioning special committee of independent directors").

[428] *Bomarko I*, 794 A.2d at 1183.

[429] *See, e.g.*, JX 43; JX 106; JX 143; JX 184; JX 217; JX 225-26; JX 233-34; JX 237; JX 247; JX 277; Davenport Tr. 599-600, 623; Fotos Tr. 786.

[430] *See* JX 226 at COWENBASHO00022216; *see also* Reisley Dep. 173-77.

venture-backed companies, pre-money valuations for financing rounds are squishy.[431] Much more could be said about this, but for present purposes, it suffices that the defendants did not prove that the Series G Financing pre-money valuation was a reliable indicator of value. Basho's valuations appeared to have more to do with Davenport's insistence on avoiding the optics of a down round than with any principled valuation techniques.[432] More importantly, the pre-money valuation says nothing about the other terms of the Series G Financing, such as (i) the amount of new money that the Company received, (ii) the rights, powers, preferences, and privileges granted to holders of the Series G preferred stock, and (iii) the effect of the transaction on holders of other classes and series of stock.

The weight of contemporaneous evidence indicates that the terms of the Series G Financing were not fair. A committee of the Board initially rejected the terms because they were so onerous.[433] A Cowen representative described the proposal by Georgetown as a

---

[431] *See* Spencer Williams, *Venture Capital Contract Design: An Empirical Analysis of the Connection Between Bargaining Power and Venture Financing Contract Terms*, 23 Fordham J. Corp. & Fin. L. 105, 126-28, 156 (2017); Andy Smith & Ryan Berry, *The Phantom of Pre-Money and Post-Money Valuations*, 15 Valuation Strategies 26 (2012); Michael A. Woronoff & Jonathan A. Rosen, *Effective vs. Nominal Valuations in Venture Capital Investing*, 2 N.Y.U. J. L. & Bus. 199, 199-207 (2005). *See also* Galleher Tr. 342-43; Galleher Dep. 175.

[432] *See* JX 145 ("While I understand the sensitivity in protecting the interests of existing investors and not signaling a down round to the market, in my experience I have found that employees and customers care more about a business that is properly capitalized and the attributes of the product they're purchasing . . . . I have never heard of a customer not buying technology because the valuation in the current round was lower than the last."); Fotos Tr. 734.

[433] *See* JX 159.

bid from "Davenport . . . who wants to take over the company [on] very unfavorable terms."[434] As already noted, Southeast regarded the terms as punitive.

In the final term sheet, Georgetown made only minor changes. Collins and six other executives indicated that they would resign if the financing was approved.[435] The head of engineering indicated that a large part of his team would also leave.[436]

Comparing the major terms of the Series G Financing with its closest competitor evidences its unfairness. Although the Southeast deal did not reach fruition, it provides an indication of arm's-length terms from a third-party investor.

| Southeast Proposal[437] | Series G Financing[438] |
|---|---|
| • Total round of $30M with $20M initially and $10M follow on.<br>• $20 million included conversion of $7.5 million under Loan Agreement.<br>• Southeast fully funds round with new money unless other investors participate.<br>• Later modified to accommodate $10M from Georgetown. | • Total round of $25M.<br>• Only $2.5M in new money from Georgetown plus conversion of $7.5 million under Loan Agreement. |
| • 2x liquidation preference. | • 2x liquidation preference, reduced to 1x for a sale in 2014. |
| • 5% cumulative dividend, payable upon liquidation or winding up. | • 8% cumulative dividend. |

---

[434] JX 243.

[435] *See* JX 356.

[436] *See id.*

[437] JX 195.

[438] JX 354 & JX 146. The final terms were implemented in the Company's Eighth Amended and Restated Certificate of Incorporation. *See* JX 376.

| | |
|---|---|
| • Holders of Series G designate 5 of 9 Board seats; Southeast designates 2 of the 5. | • Georgetown designates 4 of 7 Board seats. |
| • Conversion into existing, single-vote common stock. | • Conversion into new Class B common stock carrying 10 votes per share. |
| • Consent of Series G required for certain significant transactions. | • Consent of Series G required for all significant transactions. |
| • Voting rights on an as-converted basis. | • Voting rights on an as-converted basis, resulting in control of a majority of the outstanding voting power. |
| • One time transaction fee for Southeast of $100,000. | • Annual management fee for Georgetown of $200,000. |

As the summary indicates, the Series G Financing resulted in Georgetown controlling a majority of the Company's voting power and a majority of its Board seats, despite providing only $2.5 million in new money.[439]

Thornley voted to approve Series G Financing only because he felt he had no choice. Galleher felt the same way and lodged a lengthy objection to the transaction. Within three months, six senior officers and directors, including Collins, Brewer, and Thornley, had resigned over the deal.[440]

In perhaps the most telling source of market evidence, after closing its portion of the transaction, Georgetown was unable to convince third parties to participate. Rather than

---

[439] JX 354; JX 247 at COWENBASHO00022541; *see also* Subudhayangkul Dep. 111.

[440] *See* Galleher 263-65.

viewing the deal as highly attractive, investors saw its oppressive terms as a warning sign about how Georgetown treated the Company and its fellow investors.

Georgetown and Davenport failed to prove that the substantive terms of the Series G Financing were fair.

### c. The Unitary Determination of Fairness

Georgetown and Davenport did not prove that the Series G Financing was entirely fair. They did not demonstrate fairness as to process or price. To the contrary, the Series G Financing was an oppressive transaction that Georgetown and Davenport forced the Company to accept.

### 3. Causally Related Injury

The plaintiffs proved at trial by a preponderance of the evidence that the Series G Financing injured the Company and the plaintiffs. Its onerous terms directly reallocated value from the Company and its other stockholders to Georgetown.

### 4. The Defense Of Acquiescence

Georgetown and Davenport contend that because Galleher voted in favor of the Series G Financing, he acquiesced to its terms and neither he nor the entities he controls can be awarded a remedy. Georgetown and Davenport make a comparable argument based on estoppel.

Estoppel and acquiescence are closely related doctrines:

Estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded . . . from asserting rights which might perhaps have otherwise existed, . . . as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse . . . . [A]cquiescence in the wrongful conduct of another by which

one's rights are invaded may often operate, upon the principles of and in analogy to estoppel, to preclude the injured party from obtaining many distinctively equitable remedies to which he would otherwise be entitled.[441]

In my view, Galleher's approval of the Series G Financing fits better within the doctrine of acquiescence. Except for voting in favor (an obviously significant fact), Galleher steadfastly opposed the Series G Financing. For purposes of estoppel, he never represented to the defendants that he would not challenge their actions. Instead, he listed numerous objections to the deal and insisted that his objections be documented in the minutes. This decision therefore analyzes Galleher's approval from the standpoint of acquiescence.

Acquiescence is an affirmative defense.[442] In order to prevail, the defendant must show that

> [the] complainant has full knowledge of his rights and the material facts and (1) remains inactive for a considerable time; (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved.[443]

---

[441] *Kahn v. Household Acq. Corp.*, 591 A.2d 166, 176 (Del. 1991) (alterations omitted) (internal quotation marks and citations omitted) (quoting 3 Spencer W. Symons, *Pomeroy's Equity Jurisprudence* §§ 804, 817 (5th ed. 1941)).

[442] *See McCafferty v. Wells Fargo Bank, N.A.*, 105 A.3d 989 (Del. 2014) (TABLE) (listing acquiescence as an affirmative defense); *Robinson v. Oakwood Vill., LLC*, 2017 WL 1548549, at *21 (Del. Ch. April 28, 2017) (same); *Lehman Bros. Hldgs. Inc. v. Spanish Broad. Sys., Inc.*, 2014 WL 718430, at *7 (Del. Ch. Feb. 25, 2014) (same).

[443] *Bakerman v. Sidney Frank Importing Co., Inc.*, 2006 WL 3927242, at *17 (Del. Ch. Oct. 10, 2006) (internal quotation marks omitted) (quoting *Cantor Fitzgerald L.P. v. Cantor*, 2000 WL 307370, at *24 (Del. Ch. Mar. 13, 2000)).

Said differently, "the defendants must show that [the plaintiff] essentially consented to the [challenged action] before or after the fact."[444]

When evaluating an equitable defense, a court of equity will look beyond surface-level compliance to consider the underlying facts and circumstances. The conceptually similar doctrine of ratification illustrates this principle. Although ratification is a powerful defense, it will not apply if approval is "deemed the result of inequitable coercion or [a] similar violation of equitable duties and principles such that the asserted ratification cannot be viewed as having a cleansing effect or as cloaking the challenged transaction with presumptive validity."[445] The presence of a controller also changes the analysis: When a controller imposes a transaction on a corporation, approval from either the board or the stockholders will not prevent an entire fairness challenge.[446] The controller instead must

---

[444] *Stengel v. Rotman*, 2001 WL 221512, at *6 (Del. Ch. Feb. 26, 2001) (Strine, V.C.).

[445] Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 11.05[b][7] (2012).

[446] *See, e.g.*, *PNB Hldg.*, 2006 WL 2403999, at *14 n.71 ("In the context of a going private transaction with a controlling stockholder, there are reasons why the simple fact that a majority of the disinterested electorate votes yes on a merger might be deemed insufficient to be given ratification effect."); *In re JCC Hldg. Co., Inc.*, 843 A.2d 713, 723 (Del. Ch. 2003) (Strine, V.C.) ("This inherent coercion [of a controlling stockholder] is thought to undermine the fairness-guaranteeing effect of a majority-of-the-minority vote condition because coerced fear or a hopeless acceptance of a dominant power's will, rather than rational self-interest, is deemed likely to be the animating force behind the minority's decision to approve the merger."); *In re Wheelabrator Techs., Inc. S'holders Litig.*, 663 A.2d 1194, 1203 (Del. Ch. 1995) ("[W]here the merger [between a controlling stockholder and its subsidiary] is conditioned upon approval by a 'majority of the minority' stockholder vote, and such approval is granted, the standard of review remains entire fairness, but the burden of demonstrating that the merger was unfair shifts to the plaintiff."); J. Travis

103

agree before any negotiations begin that the controller will not proceed with the proposed transaction without both (i) the affirmative recommendation of a sufficiently authorized board committee composed of independent and disinterested directors and (ii) the affirmative vote of a majority of the shares owned by stockholders who are not affiliated with the controller.[447]

This court has applied similar principles to the defense of acquiescence. In *Bakerman*, the defendants sought to effectuate a sale of a limited liability company that would enrich them disproportionately. The plaintiff opposed the transaction and informed the defendants that he would not consent. At that point, the defendants gave the plaintiff (Bakerman) an ultimatum with less than half an hour to choose one of three options:

> a. Bakerman could sign the consent, keep his employment at SFIC, and receive $700,000 (similar to the bonuses that all SFIC employees would receive upon the closing of the sale with Bacardi);
>
> b. Bakerman could sign the consent, resign his employment at SFIC, and receive $1,000,000 in severance from SFIC; or
>
> c. Bakerman could refuse to sign the consent, have his employment terminated by SFIC, and be sued by SFIC.[448]

---

Laster, *The Effect of Stockholder Approval on Enhanced Scrutiny*, 40 Wm. Mitchell L. Rev. 1443, 1461 (2014) ("Because the controller's influence operates at both the board and stockholder levels, neither a special committee nor a majority-of-the-minority vote, standing alone, is sufficient to sterilize the controller's influence and reestablish the presence of a qualified decision maker.").

[447] *In re MFW S'holders Litig.*, 67 A.3d 496, 502 (Del. Ch. 2013), *aff'd sub nom. MFW II*, 88 A.3d 635.

[448] *Bakerman*, 2006 WL 3927242, at *5.

The defendants told Bakerman that if he did not choose within the allotted time, then the third option would be chosen for him. Bakerman chose the first option, telling the defendants that he needed to keep his job and therefore would sign the consent.[449]

When Bakerman challenged the transaction, the defendants raised the defense of acquiescence. This court found that Bakerman had not acquiesced because he "did not show unequivocal approval of the allocation, as he vigorously objected to the allocation, even as he was allegedly coerced into consenting."[450]

The affirmative defense of acquiescence likewise does not apply in this case. As this decision already has discussed at length, Georgetown and Davenport imposed the Series G Financing on the Company. They blocked other financing opportunities so that the Company had no alternative, and they limited the Company's access to funding under the Loan Agreement to place maximum pressure on the Company. When the Company had reached the point where it risked not meeting its next payroll, Georgetown presented the Series G Financing and gave the Board less than twenty hours to accept it. During the period leading up to the crisis, Georgetown and Davenport had threatened Galleher and other directors and officers with litigation if they did not approve the Series G Financing. Galleher attempted to negotiate better terms, but Georgetown refused. Galleher and the

---

[449] *Id.*

[450] *Id.* at *18.

other directors faced a Morton's Fork: approve the unfair offer or destroy the Company.[451] Under these factual circumstances, the equitable defense of acquiescence is unavailable to the defendants.

Georgetown and Davenport have argued that the Board approved the Series G Financing a second time on January 23, 2014, when they voted in favor of the definitive transaction documents. The situation had not changed, and Georgetown (through Reisley) continued to pressure the directors.[452] Brewer was fed up and resigned.[453] The remaining directors approved the documents less than twenty-four hours after receiving them.[454] The second approval was no better than the first.

"A fiduciary may not play 'hardball' with those to whom he owes fiduciary duties, and our law provides recourse against disloyal fiduciaries or controllers who use their power to coerce the minority into economic submission."[455] Acquiescence does not apply to the facts of this case.

---

[451] PTO ¶ 41; JX 361 at BTH00004246.

[452] *See* JX 373.

[453] JX 374; *see also* JX 373.

[454] PTO ¶ 43.

[455] *Auriga*, 40 A.3d at 870.

### 5.    The Remedy For The Series G Financing

Once a breach of duty has been established, this court's "powers are complete to fashion any form of equitable and monetary relief as may be appropriate . . . ."[456] "In determining damages, the powers of the Court of Chancery are very broad in fashioning equitable and monetary relief under the entire fairness standard as may be appropriate, including rescissory damages."[457]

The plaintiffs retained David G. Clarke, ASA, to calculate the damages that the plaintiffs suffered as a result of the Series G Financing. In his initial report, Clarke derived damages by comparing the value of Basho after the Series G Financing to the value that he believed Basho could have achieved through a hypothetical transaction with Southeast at a $110 million pre-money valuation.[458] I do not believe that Southeast ever made serious overtures to Basho at a valuation of $110 million. The best offer that Southeast made contemplated a pre-money valuation of $75 million, and that was without any commitment from Noonan to invest.[459] Miller believed that Noonan's involvement was critical, and a deal would not have gone forward without Noonan.

---

[456] *Weinberger*, 457 A.2d at 714.

[457] *Int'l Telecharge, Inc. v. Bomarko, Inc.* (*Bomarko II*), 766 A.2d 437, 440 (Del. 2000).

[458] *See* JX 750 at 33-36; Clarke Tr. 845-46.

[459] *See* JX 303 at 3-5; 1 Miller Dep. 41, 43-45.

In a supplemental report, Clark calculated damages using two contemporaneous valuations of Basho conducted to satisfy Section 409(a) of the Internal Revenue Code.[460] The Board approved a Section 409(a) valuation dated December 31, 2012, prepared by Murray Devine Valuation Advisors (the "2012 Valuation") and a Section 409(a) valuation dated January 23, 2014, prepared by CGFI Valuation Services (the "2014 Valuation").[461] The 2012 Valuation preceded Georgetown's efforts during 2013 to pressure the Company into accepting the Series G Financing by depriving it of capital. The 2014 Valuation coincided with the Series G Financing close. The valuations therefore provided a real-time, non-litigation driven, before-and-after assessment of the Company's value.

The defendants objected to Clarke's reliance on the hypothetical Southeast transaction to calculate a damages award. They did not object to the concept of using the Section 409(a) valuations to craft a damages award,[462] although they did raise one methodological objection.[463]

In my view, the Section 409(a) valuations provide a reliable and fair basis for imposing a remedy. Federal law mandates that if an issuer wants to avoid generating immediate income for an option recipient, then the exercise price for the option must be equal to or greater than the "fair market value of the stock at the time such option is granted

---

[460] Dkt. 268.

[461] *See* Dkt. 274 at 33-34; JX 53; JX 380.

[462] *See* Dkt. 274 at 82-83.

[463] Dkt. 277 at 2.

. . . ."[464] IRS regulations require that a non-public company determine fair market value by taking into account "the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors."[465] Serious penalties attach when taxpayers make false statements to the IRS.[466] Davenport approved these valuations as a member of the Board, and by law he was required to have a good faith belief that the valuations were accurate. He therefore should not be heard now to complain about the figures.

The 2012 Valuation valued Basho's common stock at $.43 per share. The underlying calculation included a discount for lack of marketability of 22.5%.[467] Clarke used this figure to value the plaintiffs' shares of common stock, then used the terms of the preferred stock to derive a valuation for the plaintiffs' shares of preferred stock. Based on these calculations, the total value of Galleher's pre-Series G Financing equity was $20,268,878.

The 2014 Valuation valued Basho's common stock at $.13 per share. The underlying calculation included a discount for lack of marketability of 20%.[468] Clarke

---

[464] 26 U.S.C. § 422(b)(4).

[465] 26 C.F.R. § 20.2031–2(f)(2).

[466] *See* 26 U.S.C. § 6662 (civil penalty for accuracy-related tax underpayment); *id.* § 6663 (civil penalty for fraudulent tax underpayment); *id.* § 6701 (civil penalty for aiding and abetting understatement of tax liability); *id.* § 7201 (criminal penalty for willfully attempting to evade or defeat tax).

[467] JX 53 at 16-17.

[468] JX 380 at 18.

performed the same analysis as he did with the 2012 Valuation, but he added a second discount for marketability that cut the value of the post-Series-G-Financing equity by an additional 20%. The purpose of this additional discount seems to be to recognize that the terms of the Series G Financing were onerous.[469] The defendants objected to the additional discount, which does not appear warranted: the 2014 Valuation took into account the onerous terms of the Series G Financing when calculating the 20% discount.[470] Using the 2014 Valuation's figure of $.13 per share, Clarke's model generates a value for the plaintiffs' post-Series G equity of $2,778,228.

Subtracting the value of the plaintiffs' post-Series G equity from the value of the plaintiffs' pre-Series G equity indicates that the plaintiffs suffered damages of $17,490,650 from the Series G Financing. As a remedy for their breach of fiduciary duty in connection with the Series G Financing, Georgetown and Davenport are jointly and severally liable for this amount, plus pre- and post-judgment interest calculated at the legal rate, compounded quarterly, and running from January 23, 2014, to the date of payment, with the rate of interest fluctuating with changes in the legal rate.[471]

---

[469] *See* Dkt. 268 at 5 (noting that "because of the onerous economic and governance terms attributed to the preferred G shares, an additional discount, incremental to the already inherent discount, needed to be applied to the remaining share classes."); *see also id.* at 10 (noting that "[t]here is no reason to apply a DLOM to a value per share that already reflects a discount for lack of marketability.").

[470] JX 380 at 17-18.

[471] *See* 6 *Del. C.* § 2301(a); *Levey v. Browstone Asset Mgmt., LP*, 2014 WL 4290192, at *1 (Del. Ch. Aug. 29, 2014) (explaining rationale for fluctuating rate); *Taylor v. Am. Specialty Retailing Gp., Inc.*, 2003 WL 21753752, at *13 (Del. Ch. July 25, 2003) (using

**B. The Challenge To The Defendants' Conduct After The Series G Financing**

The plaintiffs contend that after the Series G Financing, Georgetown, Davenport, and Fotos breached their fiduciary duties by causing Basho to enter into a series of unfair, self-dealing transactions that ultimately resulted in Basho entering receivership. The plaintiffs satisfied all of the requirements necessary to receive a meaningful remedy for the injury that the defendants caused during this period.

### 1. Fiduciary Status

The first question is whether the plaintiffs proved that Georgetown, Davenport, and Fotos owed fiduciary duties in connection with the actions they took after the Series G Financing. They did.

After the Series G Financing, Georgetown controlled a mathematical majority of the Company's voting power. For purposes of Delaware law, it controlled the Company and was obligated to act as a fiduciary.[472]

After the Series G Financing, Davenport continued to serve as a director. After the Board meeting on January 24, 2013, Davenport assumed the title of "Executive Chairman"

---

quarterly compounding interval for legal rate "due to the fact that the legal rate of interest most nearly resembles a return on a bond, which typically compounds quarterly").

[472] *See Lynch I*, 638 A.2d at 1113 (observing that a stockholder becomes a fiduciary if it "'owns a majority interest in . . . the corporation.'") (quoting *Ivanhoe*, 535 A.2d at 1344)).

and purported to act as an officer of the Company.[473] In these capacities, Davenport owed fiduciary duties to the Company and its stockholders.

Fotos joined the Board as a Georgetown-designated director on January 24, 2013, at the outset of the first meeting after the Series G Financing.[474] Fotos owed fiduciary duties in his capacity as a director.

### 2.    Breach

The next question is whether Georgetown, Davenport, and Fotos breached their fiduciary duties during the period following the Series G Financing. The plaintiffs proved that Georgetown, Davenport, and Fotos managed the Company to serve Georgetown's interests, rather than the interests of the Company and the stockholders as a whole.

### a.    Consolidation of Control

Immediately after the Series G Financing, Davenport, Fotos, and Reisley took steps to consolidate Georgetown's control during the Board meeting on January 24, 2014. Collins had resigned on January 17 after learning that the Southeast deal had failed and receiving the final Series G term sheet.[475] Brewer resigned after receiving the final Series G Financing documents.[476] At the outset of the January 24 meeting, Georgetown appointed Fotos to the Board. As a result, the Board comprised Davenport, Reisley, Fotos, Thornley,

---

[473] *See* JX 384; *see also* Galleher Tr. 280.

[474] PTO ¶ 45; Fotos Tr. 760.

[475] PTO ¶ 39; Collins Tr. 71; Galleher Tr. 264.

[476] PTO ¶ 42.

112

Yamanaka, and Galleher. At most, the three nominally disinterested directors could have created a deadlock. In reality, two of them had stopped resisting Georgetown. Davenport had yelled at and threatened Thornley to the point where he simply assented to Georgetown's wishes;[477] he would resign in a matter of weeks.[478] Yamanaka remained a director, but he was based in Japan, and his sole purpose for being on the Board was to monitor the Company for IDCF, a large customer, with the goal of "strength[ening] a mutual technical cooperation and collaboration."[479] He simply went along with whatever the Board did. Only Galleher continued to question Georgetown's actions.

During the meeting on January 24, 2014, the Georgetown representatives presented the Board with a list of previously prepared resolutions designed to solidify Georgetown's control. They chose not present the resolutions earlier so that Galleher could not analyze them and raise objections.[480] The resolutions specifically targeted Galleher, whom the Georgetown representatives correctly perceived as the only on-going source of potential

---

[477] The Series G Financing listed Thornley as a Georgetown designee to the Board. JX 354. Davenport also represented to others that he controlled Thornley and admitted so at trial. *See* JX 545 at BASH015854; Davenport Tr. 655-56.

[478] *See* Thornley Dep. 149; *see also* Galleher Tr. 279-80 (explaining that Thornley delayed his resignation to reduce the overall disruption to the Company after Collins and Brewer resigned).

[479] *See* JX 19 at BTH00034658 (IDCF investment memorandum to Basho explaining purpose of investment); JX 357 (Yamanaka's response to crisis over Series G Financing).

[480] *See* JX 383 (Reisley instructing Basho general counsel not to distribute resolutions before Board call); Galleher Tr. 282.

113

oversight and possible resistance to their actions. All of the resolutions were approved with Galleher abstaining.[481]

One resolution removed Galleher from the position of Chairman and replaced him with Davenport. When the minutes were prepared, Davenport's position was elevated to the role of Executive Chairman.[482] The minutes also reflected that Reisley received the title of Vice President. In that role, he reported directly to Davenport.[483]

Another resolution created an Executive Committee comprising Davenport, Reisley, and the Company's CEO. The resolution delegated to the Executive Committee the full power authorized by Delaware law.[484]

After the meeting, to reinforce the message that Galleher was not wanted, Davenport shut down Galleher's Company email account, his Salesforce.com account, and his Yammer account. He later terminated a consulting agreement between Galleher and the Company. Davenport instructed members of management not to communicate with Galleher.[485] Davenport also fired Latham & Watkins, the Company's longstanding outside counsel.[486]

---

[481] Galleher Tr. 281-82.

[482] *See* JX 384 at 2.

[483] Reisley Dep. 207-08.

[484] JX 384 at 3.

[485] Galleher 281, 288-89.

[486] JX 397.

As part of Georgetown's proposal for the Series G Financing, Georgetown represented that it would support an incentive and retention plan for the Company's employees. That plan was never implemented.[487] Within six months after the Series G Financing, six senior managers had resigned or been terminated.[488] This was in addition to the departures of Collins, Thornley, and Brewer.

### b.    Self-Dealing Actions

After consolidating control during the meeting on January 24, 2014, Davenport and Reisley wielded their authority as the Executive Committee to benefit Georgetown and themselves. For two months, Davenport and Reisley ran the Company while the CEO seat was vacant.[489] In March 2014, they hired Adam Wray as CEO without any input from other directors. The plaintiffs proved at trial that Wray was underqualified for the job and that Davenport and Reisley caused the Company to pay Wray an above-market incentive package, thereby enhancing Wray's loyalty to Georgetown. After hiring Wray, Davenport and Reisley continued using the Executive Committee to run the Company without Board oversight or input. The Executive Committee did not actually meet and did not make any record of its deliberations.[490] Stuff just happened.

---

[487] Galleher Tr. 268.

[488] *See id.* at 263-65.

[489] *See id.* at 283-84, 289-90; Thornley Dep. 140-42.

[490] *See* Galleher Tr. 282; Wray Dep. 98-100; *see also* Thornley Dep. 138-42, 149.

115

Effective as of January 23, 2014, Georgetown entered into an agreement with Basho to provide financing and management consulting services for compensation of $200,000 per year plus reimbursement of all expenses.[491] In April 2014, the Executive Committee engaged in self-dealing by extending Basho's consulting agreement with Reisley's company, Evergreen Capital, and restructuring Evergreen Capital's compensation to include $100,000 in Series G shares.[492] During the same month, the Executive Committee approved a $650,000 loan from Georgetown.[493]

Between June and December 2014, the Executive Committee approved a series of loans from Newport, an investment vehicle formed by Davenport. Basho borrowed $1.5 million from Newport in June 2014,[494] $250,000 in July 2014,[495] and $400,000 in September 2014.[496] In December 2014, the Executive Committee acted by written consent and authorized an additional $2 million in loans.[497]

---

[491] JX 385.

[492] JX 455.

[493] JX 459 at BTH00004468-69.

[494] JX 510.

[495] JX 534.

[496] JX 541.

[497] JX 566.

On multiple occasions, the Executive Committee extended the exercise period for warrants that Georgetown held.[498]

### c. No Effort To Show Fairness

Each of these transactions was between Basho and a party affiliated with its controlling stockholder, making entire fairness the applicable standard of review.[499] At trial, the defendants did not make any effort to prove that any of the transactions were entirely fair.

The fact that a transaction is an interested one does not inherently make it unfair. It is possible to imagine that some of the interested transactions between Basho and Georgetown might have been fair. I personally find this easiest to imagine when thinking about some of the later financings, when Basho likely could not find other sources of liquidity. At this stage of the proceeding, however, the time for hypotheticals has passed. The defendants had the burden to prove that the post-Series G transactions were entirely fair. They chose not to make that attempt. Because they bore the burden of proof and did not meet it, this decision holds that the transactions were unfair.

### 3. Causally Related Injury

The plaintiffs convinced me that with the Company laboring under the overhang of the Series G Financing, Georgetown's self-interested actions led directly to the Company's demise. Framed differently, the plaintiffs carried their burden of showing at trial that the

---

[498] *See, e.g.*, JX 461; JX 528 at BTH00004505; Galleher Tr. 290-91.

[499] *See Tremont II*, 694 A.2d at 428.

117

manner in which the defendants managed Basho after the Series G Financing, including the self-dealing transactions, played a causal role in depriving the plaintiffs' shares of any remaining value, and that the causal connection was sufficient close to warrant a remedy.

The Series G Financing had a more sustained effect than simply inflicting one-time harm on the Company and its stockholders. The Series G Financing changed how potential acquirers and investors looked at the Company. It was not possible to view the onerous terms of the Series G Financing as a positive signal. If third parties assumed that the onerous terms were necessary, then it strongly signaled that the Company was a distressed asset without real prospects that only could raise capital on extreme terms. For third parties that had a more positive view of the Company's technology and prospects, the onerous terms sent a strong signal about how Georgetown and Davenport treated their ostensible business partners. Davenport and Reisley's insistence on maintaining hard control in any further financing, combined with their frequently brusque and unprofessional manner, reinforced the impression that investors should pass. Not surprisingly, they did.

After consolidating control, the Georgetown team made business decisions that harmed the Company. These included a series of self-interested transactions, as well as other business decisions that resulted in the departures of large numbers of employees. Ordinarily, the latter types of decisions would not raise any specter of impropriety because they affect all investors equally. The Georgetown team might have been prudent or imprudent when making those decisions, and the consequences might have been fortunate or unfortunate, but there would be no grounds for a court to second guess those decisions or to infer a disloyal or selfish intent.

118

In this case, the plaintiffs convinced me that it is more likely than not (the standard for proof by a preponderance of the evidence)[500] that Georgetown acted selfishly to cut staff and expenses, regardless of the harm to the Company's long-term prospects, because Georgetown thought it could still achieve a near-term sale and extract value for itself through its senior securities. Because its investments had priority in the capital structure, Georgetown would walk away with a profit, regardless of whether the other investors would benefit. In any sale, Georgetown's loans would be paid off first. After that, Georgetown's Series G preferred stock occupied the top position in the equity, and it was accruing cumulative dividends at 8% per annum. Georgetown also was the dominant holder of the Series F preferred stock, which stood next in line. Galleher and his investment vehicles would not see a return unless the proceeds were sufficient to reach the Series E or the Series D. Earlier stage investors came after that, with the common last in line.[501]

---

[500] "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not." *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (Strine, V.C.) (internal quotation marks omitted) (quoting *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002)). "Under this standard, [the party bearing the burden] is not required to prove its claims by clear and convincing evidence or to exacting certainty. Rather, [the party] must prove only that it is more likely than not that it is entitled to relief." *Triton Const. Co. v. E. Shore Elec. Servs.*, 2009 WL 1387115, at *6 (Del. Ch. May 18, 2009), *aff'd*, 988 A.2d 938 (Del. 2010) (TABLE).

[501] For a more extensive discussion of the divergent interests created by different priorities in the capital structure, *see Trados II*, 73 A.3d at 47-51. The principal difference is that in *Trados*, the venture capital investors were trying to avoid a sideways situation. *Id.* at 51-54. In this case, Basho could not self-fund its business plan.

From the outset, Davenport wanted to sell the Company quickly.[502] After the Series G Financing, Davenport continued to focus on selling the Company.[503] He also continued to refuse to accept capital from third-party investors who would dilute Georgetown's position.[504] Davenport's desire to capture the lion's share of the return for Georgetown caused him to run the Company into the ground. And during the same period that the Company's prospects were dimming, Basho's peer companies were prospering.[505]

The plaintiffs convinced me that it was more likely than not that the defendants' actions after the Series G Financing, combined with the financing itself, led directly and ineluctably to the demise of the Company. It is not possible to trace the causal relationship with certainty. Nevertheless, the evidence at trial convinced me that the Series G Financing started the Company on a greased slide to failure, and the defendants' actions after the Series G Financing contributed to the Company's completion of that journey.

---

[502] *See, e.g.*, JX 14 (Davenport: "My objective is to sell the Company in early 2013. Assuming we exercise our option we will get the largest share of the proceeds of sale."); JX 30 ("My objective is to take total control of this Company . . . and force a near term exit that we control."); JX 32 ("I would like to use the exercise of our $5M option as the vehicle for the Basho exit."); JX 76 ("I want [Collins and Galleher] to understand that we are in full pivot and if they do not produce what we need to exit we will be ruthless."); Davenport Tr. 522-23, 569-70, 575-76.

[503] *See*, *e.g.*, JX 469 at Davenport 0010012; JX 519; JX 569 at REISLEY 000629; JX 728; Davenport Tr. 706-07, 709-12.

[504] *See, e.g.*, JX 607 (investment from FTV Capital); JX 656 (investment from JMI Equity).

[505] *See* JX 879.

Fotos tried to argue that he was a special case and should not be held liable because he was only a bit player and tried to act as an independent director.

Fotos was hardly a bit player. On January 24, 2014, he voted in favor of the Georgetown-dominated governance structure, which gave Davenport and Reisley free reign at the Company. In October 2014, he voted in favor of every self-dealing transaction Davenport and Reisley had completed as part of a blanket ratification of all of the actions taken by the Executive Committee.[506] In January 2015, he provided another blanket ratification.[507] These votes demonstrated that Fotos fully supported the actions that Georgetown took. Moreover, like Davenport and Reisley, Fotos did not only support Georgetown's efforts at formal Board meetings. As a Georgetown employee, Fotos was deeply involved in Basho matters. His participation dated back to Davenport's original consideration of an investment, when Davenport had Fotos conduct diligence on the Company.

Fotos also was not an independent director. He was a Georgetown employee who had reported to Davenport since 1989.[508] He never questioned the actions taken by the

---

[506] *See* JX 550.

[507] *See* JX 588.

[508] Fotos Tr. 819-21.

Executive Committee while Basho was "imploding,"[509] and he ratified the Executive Committee's actions without a second thought.[510]

In relative terms, Fotos was less culpable than Davenport and the other major Georgetown participant, Reisely, who settled. But that is not enough to avoid liability. Fotos harmed Basho by serving Georgetown and Davenport's interests while on the Board. He is therefore jointly and severally with the other defendants.[511]

### 4. The Remedy

"In determining damages, the powers of the Court of Chancery are very broad in fashioning equitable and monetary relief under the entire fairness standard as may be appropriate, including rescissory damages."[512] When defendant fiduciaries have failed to satisfy the entire fairness test and have breached their duty of loyalty, "the stockholders may . . . demand rescission of the transaction or, if that is impractical, the payment of rescissory damages."[513] Rescissory damages are "the monetary equivalent of rescission"

---

[509] *Id.* at 789.

[510] *Id.* at 803-12.

[511] *See ATR-KIM Eng Fin. Corp. v. Araneta*, 2006 WL 3783520, at *19-20 (Del. Ch. Dec. 21, 2006) (Strine, V.C.).

[512] *Bomarko II*, 766 A.2d at 440.

[513] *Oberly v. Kirby*, 592 A.2d 445, 466 (Del. 1991); *see* Wolfe & Pittenger, *supra*, § 12.04[b] ("[T]he Delaware Supreme Court has suggested on more than one occasion that rescissory damages are the preferred remedial measure where a transaction fails to pass the test of entire fairness . . . .").

and may be awarded when "the equitable remedy of rescission is impractical."[514] Delaware courts have awarded rescissory damages for adjudicated breaches of the duty of loyalty, particularly in cases where a fiduciary has selfishly appropriated the property of a beneficiary.[515] Rescissory damages differ from compensatory damages in that the loss can be measured at the time of judgment rather than at the time of the injury.[516] An award incorporating rescissory elements may be appropriate "particularly where fraud, misrepresentation, self-dealing, deliberate waste of corporate assets, or gross and palpable overreaching are involved."[517]

"Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly."[518] Damages must be "logically and reasonably related to the harm or injury for which compensation is being awarded."[519] But as long as that connection exists, "[t]he law does not require certainty in the award of damages where a

---

[514] *Vickers II*, 429 A.2d at 501; *accord In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 815 (Del. Ch. 2011) (Strine, C.) ("Rescissory damages are the economic equivalent of rescission . . . ."), *aff'd sub nom. Ams. Mining*, 51 A.3d 1213; *Technicolor Plenary IV*, 663 A.2d at 1144 (explaining that rescissory damages are warranted "when equitable rescission of a transaction would be appropriate, but is not feasible"). *See generally* Wolfe & Pittinger, *supra*, § 12.04[b].

[515] *See Strassburger v. Earley*, 752 A.2d 557, 581 (Del. Ch. 2000); *Technicolor Plenary IV*, 663 A.2d at 1144.

[516] *See Orchard* 88 A.3d at 39.

[517] *Weinberger*, 457 A.2d at 714.

[518] *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996).

[519] *J.P. Morgan*, 906 A.2d at 773.

wrong has been proven and injury established. Responsible estimates that lack m[a]thematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages."[520] "[O]nce a breach of duty is established, uncertainties in awarding damages are generally resolved against the wrongdoer."[521]

The plaintiffs seek a rescissory damages remedy equal to the difference between the value of their equity after the Series G Financing and its current value. As discussed previously, the value of the plaintiffs' equity after the Series G Financing was $2,778,228. Its value is currently worthless.

In my view, a damages award of this nature is warranted on the facts of this case, given the egregious manner in which Georgetown operated the Company after taking control through the Series G Financing. Through the Executive Committee, Georgetown froze out the Company's other directors, managed the Company unilaterally and in Georgetown's own interest, and then demanded that the directors periodically ratify everything that had been done. During this period, Georgetown engaged in self-dealing and continued to reject offers of third-party capital so as to maintain its position of control. Given this course of conduct and the ultimate result, the plaintiffs have not sought to tie

---

[520] *Red Sail Easter Ltd. P'rs v. Radio City Music Hall Prods., Inc.*, 1992 WL 251380, at *7 (Del. Ch. Sept. 29, 1992) (Allen, C.).

[521] *Thorpe v. CERBCO, Inc.*, 1993 WL 443406, at *12 (Del. Ch. Oct. 29, 1993) (Allen, C.).

specific damages amounts to specific decisions. Instead, they have sought what I regard as an apt remedy for the defendants' behavior.

The award differs from the usual concept of rescissory damages. Traditionally in Delaware, rescissory damages could come into play when a defendant fiduciary wrongfully took control of property, and the value of the property went up during the period of the fiduciary's control. In that setting, the law does not limit the plaintiff beneficiary to the value of the property at the time of the taking, plus an award of interest. The plaintiff beneficiary is entitled to recover the property itself or a measure of its full value. In this case, the plaintiffs have invoked the reciprocal of these principles. The defendant fiduciaries wrongfully took control of the property and, through a combination of the taking and their subsequent use of the property, destroyed its value entirely. In both settings, the same overarching principle governs: The disloyal fiduciary who wrongfully takes property from the beneficiary is liable for changes in value while the wrongfully taken property is under the disloyal fiduciary's control.

As an award of damages for their breaches of fiduciary duty after the Series G Financing, Georgetown, Davenport, and Fotos are jointly and severally liable for $2,778,228. Because this award is measured at the date of judgment, the plaintiffs will not receive prejudgment interest. Post-judgment interest calculated at the legal rate, compounded quarterly, is due on this amount from the date of judgment until the date of payment, with the rate of interest fluctuating with changes in the legal rate.

## III.      CONCLUSION

Georgetown and Davenport breached their fiduciary duties by forcing the Company to enter into the Series G Financing. As a remedy for their breach of fiduciary duty in connection with the Series G Financing, Georgetown and Davenport are jointly and severally liable for $17,490,650, plus pre- and post-judgment interest calculated at the legal rate, compounded quarterly, and running from January 23, 2014, to the date of payment, with the rate of interest fluctuating with changes in the legal rate.

Georgetown, Davenport, and Fotos breached their fiduciary duties by operating the Company after the Series G Financing for the benefit of Georgetown, including by entering into a series of self-interested transactions. As damages for their breaches of fiduciary duty after the Series G Financing, they are jointly and severally liable for $2,778,228, plus post-judgment interest calculated at the legal rate, compounded quarterly, and running from the date of judgment until the date of payment, with the rate of interest fluctuating with changes in the legal rate.

As the prevailing party, the plaintiffs are awarded costs. Within thirty days, the parties shall submit a joint letter identifying any other matters that the court needs to address to bring this matter to a conclusion at the trial level. If there are no other matters, then the parties shall instead submit a final order that has been agreed upon as to form.